## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF PENNSYLVANIA

STEVEN H. UNTRACHT, MD, PhD,  )
FACS                          )
                              )
        Plaintiff,            )
                              )
    v.                        )    Civil Action No. 03-199J
                              )
ERDEN FIKRI, MD, et al.       )
                              )
                              )
        Defendants.           )

## MEMORANDUM OPINION and ORDER OF COURT

**GIBSON, J.**

### SYNOPSIS

This matter comes before the Court on the following motions: Motion to Dismiss Plaintiff's

Second Amended Complaint[1] by Erden Fikri, Dinesh Mathur, Vincent Fiorica, Terry Wahl, David R.

Davis, Sanders Ergas, P. James Ridella, Bhaskaran Murali, Will H. Farthing, Brian Gunnlaugson,

Richard Cartwright, Denise Weisbrodt, William M. Carney, Harvey Slater, George H. Benz, Jr., Stewart

M. Flam, R. Joseph Federowicz, Dickey McCamey & Chilcote, P.C., UPMC Health System and UPMC

Lee Regional (hereinafter sometimes referred to as "Lee Defendants") (Document No. 136), their Brief

in Support (Document No. 137) and their Revised Exhibits in Support (Document No. 142); Motion

to Amend the Caption by Richard Saluzzo, Jacob Kolff, Bruce Duke, Narendra Pai, William Fritz, Paul

---

[1]As explained in Analysis, II. Legal Standard of this opinion, this pleading is also treated as a motion for summary
judgment.

1

Weygandt, William M. Carney, Robert D. Fry, Conemaugh Health System and Memorial Medical Center (hereinafter sometimes referred to as "Conemaugh Defendants") (Document No. 138); Motion to Dismiss, or, in the Alternative, for Summary Judgment with Respect to Plaintiff's Second Amended Complaint by Conemaugh Defendants (Document No. 139), their Brief in Support (Document No. 140) and their Appendix to their Brief in Support (Document No. 141); Plaintiff's Cross Motion for Summary Judgment, Injunctive Relief[2] and for the Court's Assumption of Supplemental Jurisdiction (Document No. 146) and his Brief in Support (Document No. 147); Conemaugh Defendants' Response to Plaintiff's Cross Motion for Summary Judgment, Injunctive Relief and for the Court's Assumption of Supplemental Jurisdiction (Document No. 151) and their Brief in Support (Document No. 152); Lee Defendants' Response to Plaintiff's Cross Motion for Summary Judgment, Injunctive Relief and for the Court's Assumption of Supplemental Jurisdiction (Document No. 154) and their Brief in Support (Document No. 155); and Motion to Dismiss Plaintiff's Second Amended Complaint by Lee Regional Health Systems, Inc. and Lee Regional Health System Foundation, Inc. (Document No. 161) and their Brief in Support (Document No. 162); and Plaintiff's Brief in Opposition to Lee Regional Health Systems, Inc. and Lee Regional Health System Foundation, Inc.'s Motion to Dismiss (Document No. 163). For the reasons stated herein, the Defendants' Motions are granted, except the Motion to Amend the Caption which is rendered moot, and Plaintiff's Motions are denied.

---

[2]Despite Plaintiff's caption, he makes no claim for injunctive relief in his motion, therefore, his motion for injunctive relief is denied herein without additional discussion. (*See* Doc. No. 146).

2

## JURISDICTION

Jurisdiction is proper in the United States District Court for the Western District of Pennsylvania pursuant to 28 U.S.C. §1331 based on federal question jurisdiction and § 1367 based on supplemental jurisdiction.

## PARTIES

For purposes of this Memorandum Opinion and Order the Court has broken the Defendants into three groups based on their representation. The Lee Defendants, the Conemaugh Defendants, and Lee Regional Health Systems, Inc. and Lee Regional Health System Foundation, Inc. The main purpose of the breakdown is for ease of reference when the Court must refer to all of the Defendants in a particular group. The Court may, however, at times refer to a Defendant individually, refer to all Defendants or refer to a different, but clearly identified, group of Defendants as necessary in the circumstances.

## BACKGROUND

### I. MATERIAL FACTS[3]

Plaintiff began his medical career in New Jersey with the Garden State Medical Staff. *Untracht v. West Jersey Health System, et al.*, 803 F. Supp. 978, 980 (D.N.J. 1992). In April 1990, Plaintiff's Garden State Medical Staff privileges were suspended. *Id.* In addition, his staff privileges at the remaining West Jersey Health System divisions were also suspended. *Id.* Plaintiff filed at least four lawsuits in state and federal court related to this turn of events. *Id.*; (Doc. No. 141, Exs. 19, 20, 22, 24). Plaintiff's federal lawsuit in New Jersey alleged violations of § 1983, the

---

[3]The parties failed to submit proposed statements of Material Facts Not in Dispute in compliance with Local Rule 56.1, therefore, the Court assessed the record and determined the relevant material facts.

3

Health Care Quality Improvement Act (hereinafter "HCQIA"), Sherman Act § 1 and § 2 and tortious interference with prospective economic advantage. *Id.* at 981. The lawsuit was dismissed by the New Jersey District Court. *Untracht v. West Jersey Health System, et al.*, 803 F.Supp. 978, 978 (D.N.J. 1992), *aff'd Untracht v. West Jersey Health System*, 998 F.2d 1006 (3d Cir. 1993); *see also Untracht v. Weimann*, 141 Fed. Appx. 46, 47-49, 2005 WL 1583507 *1-3 (3d Cir. 2005) (affirming the district court's dismissal of Untracht's Complaint and holding that the Complaint, which claimed violations of § 1983 resulting from defendants' alleged violations of his due process and equal protection rights by denying his reappointment application, was inextricably intertwined with his prior adjudication).

Plaintiff subsequently went to work for Corning Hospital in New York. (Doc. No. 147, p. 3). After a short time at Corning Hospital, Plaintiff applied for privileges at hospitals in the Johnstown, Pennsylvania area. (Doc. No. 147, Ex. 1 - Pl. Aff. ¶ 20).

Plaintiff applied for clinical privileges at UPMC Lee Regional Hospital (hereinafter "Lee"), Conemaugh Memorial Medical Center (hereinafter "Conemaugh") and Windber Medical Center (hereinafter "Windber"). (Doc. No. 147, Ex. 1 - Pl. Aff. ¶ 20). Plaintiff was granted staff privileges at Lee in late 1994. (Doc. No. 133, p. 6, ¶ 29). Although Plaintiff alleges he was recruited by Lee in order to help them compete against Conemaugh, he admits he applied for and was granted privileges at Conemaugh in early 1995, only a few months later. (Doc. No. 133, p. 6, ¶¶ 25, 29). By 1996, Windber had also granted Plaintiff staff privileges. (Doc. No. 147, p. 4 & Ex. 1 - Pl. Aff. ¶¶ 20, 22).   Plaintiff was reappointed at Lee in 1997. (Doc. No. 147, Ex. 1- Pl. Aff., ¶ 22). He was reappointed at Conemaugh in 1996, 1998, 2000 and 2002 and at Windber in 1998, 2000 and 2002.

4

*Id.* At the 2000 and 2002 reappointments by Conemaugh and Windber, Plaintiff informed the

respective hospitals of the actions Lee was taking against his clinical privileges that began in 1999

and provided each hospital with full documentation about every allegation that Lee had raised

against him. (Doc. No. 147, Ex. 1 - Pl. Aff. at ¶ 23). After reviewing the allegations, Conemaugh

and Windber both reappointed him without restrictions in 2000 and 2002. (Doc. No. 147, Ex. 1 -

Pl. Aff. ¶¶ 23, 24).

    A.    **LEE**

    When Plaintiff reapplied for surgical privileges at Lee in January of 1999, the Department of

Surgery Chairman, Dr. Fikri, did not recommend a reappointment. (Doc. No. 155, Ex. A - p. 8). As

a result, the Lee Medical Staff Credentials Committee (hereinafter referred to as the "Credentials

Committee") hired Dr. Milburn Jessup to provide an outside review of Plaintiff's cases. (Doc. No.

155, Ex. A, p. 8).

    Dr. Jessup offered a report dated September 1, 1999, in which he found that Plaintiff

displayed poor judgment in two of the nine cases submitted to him for review, both of which

involved fatalities. (Doc. No. 155, Ex. A, p. 8).

    Upon receipt of Dr. Jessup's report, the Credentials Committee reviewed his

recommendations. (Doc. No. 155, Ex. A, p. 8). By letter dated November 15, 1999, the Chairman

of the Board of Directors of Lee informed the Plaintiff that his surgical privileges were being

renewed for an abbreviated appointment term through July 2000 with certain requirements for

continuing peer review and a request for a series of supervised operations by surgeons at UPMC

Presbyterian Hospital. (Doc. No. 133, pp. 8-9, ¶ 42); (Doc. No. 155, Ex. A, p. 8). Plaintiff was

required to have a second surgeon present when pancreatic or liver resections were conducted. (Doc. No. 155, Ex. A, p. 8). This became a requirement that was imposed on all surgeons at Lee at the time. (Doc. No. 155, Ex. A, p. 8).

On February 23, 2000, Plaintiff filed a Complaint in Equity in the Court of Common Pleas of Cambria County, Pennsylvania (Case No. 2000-646) (hereinafter "Untracht I"), against, two of the Defendants in this federal action, UPMC Health System, Inc. (hereinafter "UPMC") and Lee. (Doc. No. 142, Ex. A). The Complaint sought to enjoin UPMC and Lee from carrying out the peer review activities outlined in the November 15, 1999 letter to Plaintiff from the Chairman of the Board of Directors at Lee and sought money damages for the alleged breach of Lee's Bylaws by UPMC and Lee.[4] *Id.*

By letter dated March 10, 2000, the Lee Board of Directors (hereinafter referred to as the "Lee Board") modified its actions relating to Plaintiff. (Doc. No. 137, p. 8). The Lee Board granted Plaintiff unrestricted clinical privileges for a two-year period retroactive to February 1, 1999. (Doc. No. 137, p. 8). The Lee Board also requested that prior to Plaintiff's next recredentialing in January 2001, Plaintiff arrange to have a series of major surgeries monitored by a surgeon not employed by Lee. (Doc. No. 137, p. 8).

By letter dated March 23, 2000, signed by Lee's Medical Director, the Chairman of the Credentials Committee and Lee's President, Plaintiff was informed that Dr. George Benz had been selected to monitor six to ten of Plaintiff's major abdominal surgeries. (Doc. No. 155, Ex. A, p. 8).

---

[4] On or about December 22, 2003, the Honorable Thomas A. Swope, Jr., of the Court of Common Pleas of Cambria County, entered an Order of Court sustaining Defendants' Preliminary Objections which dismissed Plaintiff's Complaint in Equity with Prejudice. (Doc. 142, Ex. G - Order Sustaining Defendant's Preliminary Objections Case No. 2000-646).

The letter also informed Plaintiff that because of concerns Plaintiff had previously raised concerning

peer review activities by the Lee Surgical Quality Review Committee, future issues involving

Plaintiff's care of patients at Lee would be referred to Dr. Benz for review. (Doc No. 155, Ex. A, p.

8).[5] Dr. Benz was to submit a written and verbal report to the Credentials Committee prior to its

consideration of Plaintiff's next recredentialing in January 2001. (Doc. No. 155, Ex. A, p. 8).

Throughout the period between May 2000 and February 2001, Dr. Benz observed Plaintiff

perform six surgeries and reviewed the medical records of six other patients on whom Plaintiff had

performed surgery. (Doc. No. 155, Ex. A, pp. 8-9, 14-18). On April 8, 2001, following the review

of Plaintiff's cases, Dr. Benz wrote a letter to Terry Wahl, M.D., the Medical Director of Lee, in

which he recommended that a second board certified surgeon be involved with Plaintiff in all major

abdominal procedures. (Doc. No. 155, Ex. A, p. 9). Dr. Benz' recommendation was based upon his

review of the records, as well as his personal observation of six operative procedures, four of which

---

[5]Dr. George Benz was recommended by Dr. Marshall Webster, a prominent surgeon at UPMC Presbyterian Hospital. (Doc. No. 155, Ex. A., p. 8). Dr. Benz graduated from the University of Pittsburgh School of Medicine in 1967, did his internship and residency at the University of Pittsburgh School of Medicine, Department of Surgery and was Board certified in general surgery. (Doc. No. 155, Ex. A., p. 8). He had been an assistant professor of Clinical Surgery at the University of Pittsburgh in the Surgical Department since 1975. (Doc. No. 155, Ex. A., p. 8). Dr. Benz retired in July of 2001, but maintained his medical license and remained Board certified in general surgery since 1973. (Doc. No. 155, Ex. A., p. 8). He had been on the staffs of Presbyterian University Hospital, Montefiore Hospital, and Forbes Health Systems since 1975. (Doc. No. 155, Ex. A., p. 8).

Forbes Regional Hospital is located in Monroeville, Pennsylvania, has 300 beds and approximately 20 to 25 surgeons on staff. (Doc. No. 155, Ex. A., p. 8). Dr. Benz was the Chief of the Section of General Surgery for seven years at Forbes, was on the Medical Executive Committee for 20 years and was the Coordinator of Surgical Teaching at the Forbes Family Practice Program from 1978 to 1995. (Doc. No. 155, Ex. A., p. 8). He was Chairman of the Operating Room Committee from 1987 to 1992 and Chairman of the Department of Surgery from 1990 to 1998. (Doc. No. 155, Ex. A., p. 8). He was also President of the Medical Staff from 1986 to 1987. (Doc. No. 155, Ex. A., p. 8). He had been involved in the prior review of surgeons including a protracted review of a surgeon in Meadville, Pennsylvania, where he scrubbed with the doctor to observe the surgical techniques and he also monitored other surgeons at Forbes in his role as Chief of Surgery and has extensive peer review experience. (Doc. No. 155, Ex. A., p. 8-9). Additionally, he was involved in at least five or six reviews of surgeons at Forbes. (Doc. No. 155, Ex. A., p. 9).

7

were major abdominal surgeries. (Doc. No. 155, Ex. A, p. 9).

On May 7, 2001, after Plaintiff had an opportunity to review Dr. Benz' recommendation, his request to appear before the Credentials Committee to rebut the recommendation was granted. (Doc. No. 155, Ex. A, p. 18). Subsequent to reviewing Plaintiff's thirty-three page letter, submitting it to Dr. Benz for comment and listening to Plaintiff's oral argument, the Credentials Committee recommended to the Lee Medical Staff Executive Committee (hereinafter the "Executive Committee") that Plaintiff's grant of clinical privileges be subject to the second surgeon requirement recommended by Dr. Benz. (Doc. No. 155, Ex. A, p. 18).

Lee further selected Dr. Harvey Slater to "review the reviewers." (Doc. No. 155, Ex. A, p. 9). Dr. Slater reviewed the cases under a "totality of circumstances basis." (Doc. No. 155, Ex. A, p. 10). Dr. Slater believed that the cases should not be reviewed in isolation and, in light of all the matters that he reviewed, believed the recommendation to be appropriate. (Doc. No. 155, Ex. A, p. 10).

On July 25, 2001, Plaintiff filed a Complaint for damages against Erden Fikri, M.D., Vincent Fiorica, M.D., Terry Wahl, M.D., David R. Davis, and Lee in the Court of Common Pleas of Cambria County, Pennsylvania (Case No. 2001-2718) (hereinafter "Untracht II"). (Doc. No. 142, Ex. B). All Defendants in Untracht II are Responding Defendants in this federal action. (Doc. No. 142, Ex. B). This lawsuit set forth virtually identical factual allegations and claims against the individually named defendants as were contained in Untracht I, and reiterated causes of actions

8

against Lee and UPMC despite the existence of Untracht I.[6] (Doc. No. 142, Ex. B).

By letter dated July 13, 2001 from Lee's President and CEO, David R. Davis, Plaintiff was informed that the Executive Committee had voted to recommend to the Board of Directors that Plaintiff's clinical privileges be subject to the restriction that a second surgeon be involved in all major abdominal surgeries. (Doc. No. 155, Ex. A, p. 1). The letter also informed Plaintiff that under the Medical Staff Bylaws, Plaintiff could request a hearing before a panel of physicians prior to the recommendation being forwarded to the Board. *Id.*

On August 8, 2001, Plaintiff filed a Petition for Preliminary Injunction in Untracht I seeking to enjoin Lee and UPMC from taking action to impose or enforce the condition that he have a second surgeon present for major abdominal surgeries. (Doc. 142, Ex. C). On September 17, 2001, Lee and UPMC filed, in Untracht I, a Motion to Dismiss the Petition for Preliminary Injunction, or in the Alternative to Stay Proceedings Pending Exhaustion of Plaintiff's Internal Remedies Under Lee's Medical Staff Bylaws. (Doc. 155, Ex. A to Ex. B, p. 2).

By letter dated August 14, 2001 to the President of Lee, Plaintiff requested a hearing under Lee's Medical Staff Bylaws. (Doc. No. 155, Ex. A, p. 1). Dr. Ian Katz, Dr. Johnnie Barto and Dr. John J. Seeber, were appointed by Lee as a hearing panel (hereinafter the "Hearing Panel"). (Doc. No. 155, Ex. A, p. 1) These medical staff members did not actively participate in consideration of the matter at the Medical Staff Committee level and were not in direct economic competition with

---

[6]Preliminary Objections were sustained by Judge Swope in Untracht II on December 22, 2003, which dismissed the various Counts against the various defendants with prejudice. (Doc. 142, Ex. G - Order Sustaining Defendants' Preliminary Objections Case No. 2001-2718). As noted earlier, Judge Swope also sustained preliminary objections in Untracht I on December 22, 2003. *See* Footnote 3.

Plaintiff. (Doc. No. 155, Ex. A, p.1). Both parties accepted the Hearing Panel before the
proceedings began. (Doc. No. 155, Ex. A, p. 1).

The Court of Common Pleas of Cambria County issued an Order dated November 20, 2001,
"staying all proceedings before the Court pending completion of the internal remedies afforded
Plaintiff under [] Lee Hospital's Medical Staff Bylaws." (Doc. No. 142, Ex. D). Additionally, the
Court enjoined Lee from filing a report with the National Practitioner Data Bank (hereinafter
"NPDB") until permitted to do so by the Court. (Doc. No. 142, Ex. D).

On or about November 30, 2001, the internal hospital hearing requested by Plaintiff began.
(Doc. No. 155, Ex. A , p. 2). The appointed hearing officer was Daniel W. Rullo, Esquire, who
presided over the hearings. (Doc No. 155, Ex. A, p. 1). Hearings were held on December 1, 2001,
December 4, 2001, December 14, 2001, January 4, 2002, January 5, 2002, January 12, 2002, and
January 23, 2002. (Doc No. 155, Ex. A, n. 1-2). Plaintiff was represented by legal counsel at these
hearing sessions. (Doc No. 155, Ex. A, n. 1-2). During these first eight hearing sessions,[7] Hearing
Officer Rullo made certain rulings on the admissibility of evidence and other procedural issues.
(Doc. No. 137, p. 11). As part of the proceedings, testimony about surgeries performed by Plaintiff
after the recommendation that a second surgeon be present at all major abdominal surgeries
performed by Plaintiff had been rendered was introduced and extensively rebutted by Plaintiff.
(Doc. No. 155, Ex. A to Ex. B, p. 1).

---

[7]A total of nineteen hearing sessions were held over thirteen and a half months before the Hearing Panel. (Doc.
No. 155, Ex. A to Ex. B, p. 1). Both Plaintiff and Lee were given ample opportunity to present evidence in support of their
respective positions. (Doc. No. 155, Ex. A to Ex. B, p. 1). The transcript of the hearing record is over 3000 pages long and
includes over 200 exhibits. (Doc. No. 155, Ex. A, p. 2).

10

On March 11, 2002, in Untracht I, Plaintiff filed a Motion on Pending Internal Fair Hearing, requesting the Court of Common Pleas of Cambria County to review and overturn certain rulings that had been made by Hearing Officer Rullo in the internal Lee hearings. (*See* Doc. No. 142, Ex. E). By Order dated March 19, 2002, Plaintiff's motion was denied and the Court of Common Pleas of Cambria County stated that it would "not intervene in the ongoing hearing process." (Doc. 142, Ex. E).

Thereafter, further internal hearing sessions were held on March 22, 2002, April 17, 2002, April 24, 2002, and May 2, 2002. (Doc. No. 155, Ex. A, n. 2). Plaintiff represented himself at these sessions after he and his attorneys ended their attorney-client relationship. (Doc. No. 155, Ex. A, n. 1).

On June 20, 2002, despite the stay of all proceedings by the Court of Common Pleas of Cambria County in Untracht I, Plaintiff, for the third time, sought judicial intervention into the internal Lee peer review process by filing a Motion to Order Defendants to Produce Documents, Compel Testimony, and Comply With Accepted Standards of Review. (*See* Doc. No. 142, Ex. E). On July 17, 2002, the Court of Common Pleas of Cambria County denied Plaintiff's Motion and again stated it would not intervene in Lee's ongoing internal hearing process. (Doc. No. 142, Ex. F).

Further internal hearing sessions were held at Lee on May 2, 2002, August 14, 2002, August 15, 2002, October 8, 2002, November 14, 2002, November 20, 2002, December 16, 2002, and January 15, 2003. (Doc. No. 155, Ex. A, n.2). A total of nineteen hearing sessions were held. (Doc. No. 155, Ex. A, p. 2).

11

In the midst of these final internal hearing sessions, on or about November 13, 2002,

Plaintiff filed a writ of summons in the Court of Common Pleas of Cambria County, Pennsylvania

(Case No. 2002-3825) against Dr. Benz, Dr. Ridella, Dr. Fiorica, Dr. Ergas, Dr. Farthing, Dr.

Gunnlaugson, Ms. Weisbrodt, Mr. Davis, Lee, UPMC and Dr. Slater. (Doc No. 141, Pl. Depo., Ex.

31) (hereinafter "Untracht III."). This was the third lawsuit filed by Plaintiff in Cambria County

dealing with the same series of events. (*Id.*; *See* Doc. No. 142, Ex. A, B).

On March 7, 2003, following completion of the nineteen hearing sessions, the Hearing Panel

unanimously found that the recommendation of the Credentials Committee and Executive

Committee that Plaintiff have a second surgeon for all major abdominal surgeries was proper; was

supported by substantial evidence; and should be implemented. (Doc. No. 155, Ex. A, p. 23). In

accordance with Hearing Officer Rullo's interpretation of the Lee Bylaws, the Hearing Panel's only

options were to accept or reject the recommendation that a second surgeon be present with Plaintiff

whenever he performed major abdominal surgery. (Doc. No. 155, Ex. A to Ex. B, p. 1). The

Hearing Panel unanimously accepted the recommendation. (Doc. No. 155, Ex. A, p. 23). The

Hearing Panel found that Plaintiff often lacked sound medical judgment, had not been inclined to

accept criticism and may not recognize his limitations or the limitations of the facility in which he

operates. (Doc. No. 155, Ex. A, pp. 22-23).

Plaintiff appealed the Hearing Panel's recommendation to the Lee Board. (Doc. No. 155,

Ex. A to Ex. B, p. 2); (Doc. No. 147, Ex. 15). An appellate review panel was appointed by the Lee

Board to review Plaintiff's appeal (hereinafter the "Appellate Review Panel"). (Doc. No. 155, Ex.

A to Ex. B, p. 2). The Appellate Review Panel met on April 9, 2003, and reviewed the evidence

12

and transcript from the hearing sessions and the report of the Hearing Panel. (Doc. No. 147, Ex. 15 - Letter from Chairman of the Board of Trustees of Lee to Plaintiff dated June 24, 2003, p. 1). The Appellate Review Panel concluded that Plaintiff's behavior could not be corrected by merely requiring a second surgeon. (Doc. No. 155, Ex. A to Ex. B, p. 1). The Appellate Review Panel recommended that, for the protection of Lee's patients, Plaintiff's application for reappointment should be denied and his staff privileges should be terminated.[8] (Doc. No. 155, Ex. A to Ex. B, p. 2).

On May 5, 2003, the Lee Board adopted the recommendation of its Appellate Review Panel. (Doc. No. 147, Ex. 15, p. 1). By letter dated May 6, 2003, Plaintiff was advised of the Lee Board's decision to consider terminating his staff privileges. (Doc. No. 147, Ex. 15, p. 2).

The Lee Board then directed a joint committee of the Board and medical staff (hereinafter the "Joint Committee") to consider the Appellate Review Panel's recommendation that Plaintiff's staff privileges be terminated. (Doc. No. 155, Ex. A to Ex. B, p. 2; Doc. No. 147, Ex. 15, p. 1). After Plaintiff and the medical staff submitted written responses, further evidence, and oral arguments, the Joint Committee recommended that Plaintiff's staff privileges be terminated. (Doc. No. 155, Ex. A to Ex. B, p. 2); (Doc. No. 147, Ex. 15, p. 2). At the conclusion of Lee's fair hearing proceedings, on June 24, 2003, the Lee Board voted to terminate Plaintiff's staff privileges. (Doc.

---

[8]The Appellate Review Panel acknowledged that the Hearing Panel had no authority to impose a more stringent sanction on Plaintiff, but recognized that the Board did have the ultimate authority to assure the competency of its medical staff and protect its patients. (Doc. No. 147, Ex. 15 - Letter from Chairman of Board of Trustees of Lee to Plaintiff dated June 24, 2003, p. 1). Therefore, the Review Panel concluded that the evidence against Plaintiff presented during the hearing, much of which post dated the original recommendations of the Credentials and Executive Committees, supported a more stringent sanction than had originally been recommended. *Id.* at 2.

13

No. 147, Ex. 15, pp. 1-2); (Doc. No. 155, Ex. A to Ex. B, p. 2). The Lee Board notified Plaintiff of its decision by letter dated June 24, 2003. (Doc. No. 147, Ex. 15, pp. 1-2); (Doc. No. 155, Ex. A to Ex. B, p. 2).

On July 25, 2003, in Untracht I, Lee filed a Motion to End Injunction, Lift Stay or Grant Other Relief. (Doc. No. 155, Ex. B). Plaintiff filed a Motion to Continue. (Doc. No. 155, Ex. C). On September 4, 2003, the Honorable F. Joseph Leahey, of the Court of Common Pleas of Cambria County denied Plaintiff's Motion to Continue in Untracht I and entered an Order vacating the Order dated December 20, 2001 that enjoined Lee and the other defendants in Untracht I from reporting the internal actions and outcomes to the Pennsylvania State Medical Board of Medical Examiners and the NPDB. (Doc No. 147, Ex. 13).

On or about September 17, 2003, Lee made a NPDB submission reporting that Plaintiff was denied privileges for continuing problems with poor judgment and failure to provide proper patient care. (Doc. No. 137, p. 17).

On December 22, 2003, two Orders were entered, one in Untracht I and one in Untracht II, sustaining Defendants' Preliminary Objections which dismissed Plaintiff's Complaint in Equity against Lee and UPMC with prejudice and also dismissed all the other claims against the various defendants. (Doc. No. 155, Ex. G).

14

**B.    CONEMAUGH**

When Plaintiff was up for reappointment at Conemaugh in 2000 and 2002 he provided

Conemaugh with full documentation of Lee's ongoing allegations. (Doc. No. 147, Ex. 1 - Pl. Aff., ¶

63). Upon review of that documentation, Conemaugh reappointed him to its medical staff in 2000

and in February of 2002. (Doc. No. 147, Ex. 1- Pl. Aff., ¶ 31). Plaintiff experienced no problems or

adverse action at Conemaugh until November 22, 2002 when Plaintiff operated on an 85 year old

Jehovah's Witness who was suffering from colorectal cancer. (Doc. No. 147, Ex. 1 - Pl. Aff. ¶ 25).

The patient, Earl Esherick (hereinafter "EE"), died and on November 27, 2002, Plaintiff was

informed that his clinical privileges at Conemaugh were being suspended because of this patient's

death. (Doc. 147, Ex. 1 - Pl. Aff. ¶ 25). The next day, Thanksgiving 2002, Plaintiff called Dr.

Saluzzo and informed him that Plaintiff felt the patient's death was the fault of the anesthesiologists.

(Doc. No. 147, Ex. 1 - Pl. Aff. ¶ 25).

As a result of events in the operating room that led to the patient's death, and Plaintiff's

attempts to blame the anesthesiologists, the Conemaugh Credentials Committee voted to revoke his

clinical privileges on December 17, 2002. (Doc. No. 147, Ex. 1 - Pl. Aff. ¶ 33). The Conemaugh

Credentials Committee based its recommendation on four findings: 1) Plaintiff mismanaged the care

of EE; 2) Plaintiff's poor judgment was responsible for the death of EE; 3) Plaintiff behaved

unprofessionally and non-collegially by attempting to shift blame for EE's death back to the

anesthesiologists and others; and 4) Plaintiff violated a Conemaugh Medical Staff bylaw by not

signing a third-party release. (Doc. No. 133, p. 18, ¶ 86).

On December 19, 2002 Plaintiff informed EE's family of the wrongdoing Plaintiff felt

15

occurred in the deceased patient's care, including that the anesthesiologists were at fault, and Plaintiff assisted the family in finding an attorney to sue to protect their rights. (Doc. No. 133, p. 19, ¶ 88).

In response to Conemaugh's vote to revoke his privileges, Plaintiff participated in Conemaugh's fair hearing process. (Doc. No. 147, Ex. 1 - Pl. Aff. ¶ 25; Ex. 10). The hearings were conducted between March 10, 2003 and May 21, 2003.    (Doc. No. 147, Ex. 1 - Pl. Aff. ¶ 25; Ex. 10).

During the Conemaugh fair hearing process, Plaintiff called witnesses and presented evidence and Conemaugh made a determination to suspend and/or revoke his staff privileges. (Doc. No. 147, Ex. 1 - Pl. Aff., p. 8, ¶ 38). The Conemaugh hearing panel determined revocation of Plaintiff's privileges was warranted based on the unprofessional nature of Plaintiff's communications with EE's family. (Doc. No. 133, p. 19, ¶ 92).

Subsequently, Attorney Alan H. Perer, the attorney contacted by Plaintiff on behalf of EE's family, filed suit of behalf of the personal representative of EE's estate against Conemaugh and Plaintiff (no anesthesiologist or other doctors), alleging negligence on the part of Plaintiff and negligence on Conemaugh's part in granting clinical privileges to Plaintiff. (Doc No. 133, p. 20, ¶ 96; Doc. No. 147, Ex. 1 - Pl. Aff. ¶ 43). The parties agreed to binding high-low arbitration, which meant that Conemaugh and Plaintiff would have to pay regardless of the outcome and the arbitration was only to determine in what amount. (Doc. No. 133, p. 20, ¶ 97). The arbitration was held March 10, 2005. (Doc. No. 147, Exs. 8, 9). Despite the fact the arbitrator awarded $375,000 to the deceased patient's personal representative, Plaintiff elects in his pleadings to this Court to

16

characterize this as a ruling in his favor. (Doc. No. 133, p. 20, ¶ 97; Doc. No. 147, p. 20).

On or about June 9, 2003, Conemaugh made submissions to the NPDB regarding Plaintiff

on the basis of substandard and inadequate care, poor clinical judgment and unprofessional

behavior. (Doc. No. 147, Ex. 22).

## C. WINDBER

Plaintiff had privileges at Windber, which is located ten miles from Lee and eight miles from

Conemaugh. Mapquest, www.mapquest.com, (last visited July 27, 2006).[9] Windber never had any

problems with Plaintiff's patient care. (Doc. 147, Ex. 1 - Pl. Aff., ¶ 61). Plaintiff informed

Windber of the actions taken against his clinical privileges at Lee and after review of the allegations,

Windber reappointed him without restrictions in 2002. (Doc. 147, Ex. 1 - Pl. Aff., ¶ 24). In August

of 2002, however, Plaintiff voluntarily resigned his privileges at Windber. (Doc. No. 147, Ex. 1 -

Pl. Aff., ¶ 60; Doc. No. 137, Ex. B - Pl. Depo., p. 52, lines 10-16). When Plaintiff resigned his

clinical privileges at Windber, no disciplinary actions were pending at the facility, nor were any

disciplinary actions planned. (Doc. No. 147, Ex. 1- Pl. Aff., ¶ 62; Doc. No. 137, Ex. B - Pl. Depo.,

p. 52, lines 19-25).

## D. DISTRICT COURT AND REMAINING STATE COURT PROCEEDINGS

On May 14, 2003, Plaintiff filed a *pro se* complaint in the United States District Court for

the Eastern District of Pennsylvania against thirty-six defendants, including individual physicians

and health care professionals, a university, a law firm, two lawyers, an anesthesiology group, two

---

[9]A court can take judicial notice of distances. *See Gordon v. Lewiston Hosp.*, 272 F. Supp. 2d 393, 429 n. 34 (M.D. Pa. 2003) (holding a court can take judicial notice of driving distances disclosed on an internet mapping service).

health systems, four medical facilities and 20 John Doe Defendants. (Doc. No. 1). The Complaint contained 522 Paragraphs and 15 counts alleging Sherman Act violations, Section 1983 civil rights violations, tortious interference with prospective economic advantage, negligence, perjury and defamation. (Doc. No. 1).

On May 14, 2003, Plaintiff also filed a Petition for Temporary Injunction in the United States District Court for the Eastern District of Pennsylvania. (Doc. No. 2). A supporting brief was filed by Plaintiff on May 20, 2003. (Doc. Nos. 3, 4). All of the Defendants filed a timely Brief in Opposition to Plaintiff's Petition for Temporary Injunction. (Doc. Nos. 14, 15, 16, 17).

All of the Defendants filed Motions to Dismiss, Motions to Strike and Motions to Transfer Venue, as well as Briefs in Support of those Motions. (Doc. Nos. 23, 24, 25, 26, 27, 28, 30, 32, 33, 35). These were filed between June 9-12, 2003. *Id.*

On June 26, 2003, Plaintiff, without leave of Court, filed an Amended Complaint. (Doc. No. 52). The Amended Complaint did not bolster the allegations against the Defendants, nor did it cure the defects in the original Complaint. *Id.* This Amended Complaint consisted of 114 pages, 15 causes of action and 655 Paragraphs. *Id.*

Between July 7 and 11, 2003, Defendants again filed Motions to Dismiss and/or Strike Plaintiff's Amended Complaint and Motions to Transfer. (Doc. Nos. 55, 56, 57, 58, 59, 61, 62, 63, 64, 65).

On July 25, 2003, the Honorable Timothy J. Savage, of the United States District Court for the Eastern District of Pennsylvania entered an Order granting the Defendants' Motions to Transfer and transferred the case *sub judice* to the Western District of Pennsylvania. (Doc. No. 80).

18

On December 29, 2003, in the case *sub judice* Plaintiff filed a Motion to Supplement the Pleadings and a Motion and Brief for Summary Judgment and Injunctive Relief. (Doc. Nos. 86, 87, 88).

On January 5, 2004, Plaintiff revived the November 13, 2002 writ of summons which was filed a year earlier in Untracht III and, yet again, filed a Complaint against several of the Defendants named in this federal court action, and some who were named in the previous state court actions, and asserted causes of action including defamation as a result of testimony and documents provided at the Lee internal fair hearings. (Doc. No. 136, p. 5).

On March 11, 2004, in the case *sub judice* Plaintiff filed a Motion for Leave to Amend his Complaint and Brief in Support. (Doc. No. 98).

On May 28, 2004, this Court entered a Case Management Order setting the deadlines for the case, including that discovery would close on January 7, 2005. (Doc. No. 103).

Defendants sent out timely discovery requests and scheduled and conducted Plaintiff's deposition on December 20, 2004 and December 21, 2004. (Doc. No. 141, Ex. 1). Plaintiff's deposition was to be concluded at the end of December 2004/first week of January 2005; prior to the close of discovery, but at Plaintiff's request, the discovery deadline was extended until February 14, 2005. (Doc. Nos. 112, 116). Discovery was stayed on February 10, 2005 pending the Court's decision on certain motions. (Doc. No. 126). Those motions were decided on April 7, 2005. (Doc. No. 131). Discovery, therefore, was completed on April 11, 2005.

On April 7, 2005, this Court issued an Order granting defendants' Motion to [S]trike the Amended Complaint and granting Plaintiff leave to file a Second Amended Complaint, which he

19

did on April 25, 2005. (Doc. No. 131).

The motions currently pending before the Court were filed after the close of discovery between June 13, 2005 and October 21, 2005.

## ANALYSIS

## II.    LEGAL STANDARD

The Lee and Conemaugh Defendants filed Motions to Dismiss, or, in the Alternative, for Summary Judgment. (Doc. Nos. 136, 139). The Conemaugh Defendants' Motion (Document No. 139) is so captioned and the Lee Defendants' Brief in Support (Doc. No. 137) indicates the alternative in the first sentence of the Introduction. (Doc. Nos. 137, 139). Plaintiff responds to the Motions with a Cross Motion for Summary Judgment and Brief in Support. (Doc. Nos. 146, 147). Additionally, both Plaintiff and Defendants filed extensive exhibits with their Motions and Briefs in Support including: depositions; affidavits; prior state court pleadings and orders; and letters and other documentation related to the actions taken at Lee and Conemaugh. (Doc. Nos. 136, 137, 139, 140, 141, 142, 146, 147, 151, 152, 154, 155). Accordingly, the Court treats the motions before it as motions for summary judgment.

A motion to dismiss may be converted to a motion for summary judgment if the materials submitted warrant a conversion and the parties had adequate notice. *In Re Rockefeller Center Properties Inc. Securities Litig.*, 184 F.3d 280, 288 (3d Cir. 1999). The Third Circuit has held that the parties have adequate notice where some of the motions to dismiss are framed in the alternative as motions for summary judgment. *Hilfirty v. Shipman*, 91 F.3d 573, 578-79 (3d Cir. 1996).

In the case *sub judice* the Court has no question that the parties had notice that the Motions to

20

Dismiss would be treated, in the alternative, as Motions for Summary Judgment.  The Motions to

Dismiss were denoted as Motions for Summary Judgment in the alternative in either the caption of the

Motion or the first sentence of the Introduction of the Brief in Support. (Doc. Nos. 137, 139). Plaintiff

responded with a Cross Motion for Summary Judgment indicating it was clear to him Motions for

Summary Judgment had been filed by the Defendants. (Doc. No. 146).  Finally, the parties attached

extensive exhibits to their Motions. (Doc. Nos. 136, 137, 139, 140, 141, 142, 146, 147, 151, 152, 154,

155).  Accordingly, the Court treats the motions as Motions for Summary Judgment except in two

instances where a Motion to Dismiss is a more appropriate manner in which to address the issue.[10]

## A.    MOTION TO DISMISS STANDARD

In analyzing a motion to dismiss under Federal Rule of Civil Procedure 12( b)(6):

> the district court [is] required to accept as true all allegations in the complaint and all
> reasonable inferences that can be drawn from them after construing them in the light most
> favorable to the non-movant. *Rocks v. City of Philadelphia*, 868 F.2d 644, 645 (3d
> Cir.1989); *D.P. Enters., Inc. v. Bucks County Community College*, 725 F.2d 943, 944 (3d
> Cir.1984). In determining whether a claim should be dismissed under Rule 12(b)(6), a
> court looks only to the facts alleged in the complaint and its attachments without reference
> to other parts of the record. Moreover, a case should not be dismissed for failure to state
> a claim unless it clearly appears that no relief can be granted under any set of facts that
> could be proved consistently with the plaintiff's allegations. *Hishon v. King & Spalding*,
> 467 U.S. 69, 73, 104 S.Ct. 2229, 2232-33, 81 L.Ed.2d 59 (1984); *D.P. Enters.*, 725 F.2d
> at 944.

*Jordan v. Fox, Rothschild, O'Brien & Frankel*, 20 F.3d 1250, 1261 (3d Cir. 1994).  The defendant bears

the burden to demonstrate that the complaint fails to state a claim. *Gould Electronics Inc. v. U.S.*, 220

F.3d 169, 178 (3d Cir. 2000) (citing *Kehr Packages , Inc. v. Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d

---

[10]These instances involve Plaintiff's § 1981 claim for reverse national origin discrimination and Plaintiff's 42 U.S.C. § 11112 claim and are discussed more fully later in this Memorandum Opinion and Order.

Cir. 1991)).

## B. SUMMARY JUDGMENT STANDARD

Summary judgment is appropriate only when it is demonstrated that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-32, 106 S.Ct. 2548, 2552-57, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c). An issue of material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). In deciding a motion for summary judgment, all reasonable inferences must be drawn in favor of the non-movant. *Oritani [Sav. & Loan Ass'n v. Fidelity & Deposit Co.*, 989 F.2d 635, 638 (3d Cir. 1993)].

*Troy Chem. Corp. v. Teamsters Union Local No. 408*, 37 F.3d 123, 125-126 (3d Cir. 1994).

As to materiality, the substantive law will identify which facts are material. Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted. *See generally* 10A C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure § 2725, pp. 93-95 (1983). This materiality inquiry is independent of and separate from the question of the incorporation of the evidentiary standard into the summary judgment determination. That is, while the materiality determination rests on the substantive law, it is the substantive law's identification of which facts are critical and which facts are irrelevant that governs. Any proof or evidentiary requirements imposed by the substantive law are not germane to this inquiry, since materiality is only a criterion for categorizing factual disputes in their relation to the legal elements of the claim and not a criterion for evaluating the evidentiary underpinnings of those disputes.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202, 211 (1986).

## III. DISCUSSION

### A. COLLATERAL ESTOPPEL OR CLAIM PRECLUSION

#### 1. Defendant's Assertion of Collateral Estoppel or Claim Preclusion

Defendants assert that all claims before the Court in the case *sub judice* are barred by collateral estoppel or claim preclusion because Plaintiff should have asserted such claims in one of his previously

22

filed and dismissed state court cases. The cases to which Defendants refer are Untracht I and II, both of which were dismissed on the basis of preliminary objections. (Doc. No. 142, Ex. G). Defendant judicially admits in Untracht I and Untracht II that "[t]he federal action includes all of the same claims presently before this Court." (Doc. No. 155, Ex. 2, p. 3). However, the Orders dismissing Untracht I and Untracht II do not specify on which preliminary objection the cases were dismissed and Defendants do not clarify this for the Court. (Doc. No. 142, Ex. G). Furthermore, the Defendants present no argument to the Court suggesting that the preliminary objections were an adjudication on the merits. *See Parking Auth. of the City of Wilkes-Barre v. Ten East South Street Co.*, 788 A.2d 1096, 1100-01 (Pa. Commw. Ct. 2001) (holding dismissal on preliminary objections was not an adjudication on the merits and collateral estoppel did not apply). Since the preliminary objections on which the cases were dismissed are relevant to whether this Court can apply collateral estoppel or claim preclusion and since no argument is made that the preliminary objections constituted an adjudication on the merits, viewing the facts before it in the light most favorable to the Plaintiff, the Court cannot dismiss Plaintiff's claims on this basis.

### 2. Plaintiff's Assertion of Collateral Estoppel

First, Plaintiff moves for summary judgment in his favor against Conemaugh based on his assertion that Conemaugh is judicially estopped by a statement it made in its Answer in the malpractice case filed by EE's estate against Plaintiff and Conemaugh (hereinafter the "Malpractice Case") and by the position it took in the March 10, 2005 arbitration proceeding that it was not negligent in credentialing Plaintiff through November 22, 2002. The statement in Conemaugh's Answer in the Malpractice Case to which Plaintiff refers reads as follows:

23

"[I]t is denied that [Conemaugh] was negligent in credentialing Dr. Untracht. To the contrary, when Dr. Untracht was credentialed, [Conemaugh] carefully and in compliance with all hospital, state and federal regulations, did appropriately evaluate the information that was provided by Dr. Untracht requesting surgical privileges. Dr. Untracht at the time that his credentials were granted appeared to be a competent surgeon up to and including November 22, 2002 [the day of EE's operation]. At all times, [Conemaugh] exercised reasonable care in conducting an investigation into the credentials, skill, judgment and ability of Dr. Untracht up to and including November 22, 2002; The hospital did not know, nor did it have any reason to believe that there were any serious concerns or problems associated with the surgery and practice of Dr. Untracht from the time he was credentialed up to and including November 22, 2002. Further, at all times, [Conemaugh] acted in an appropriate fashion with regard to all patients. . . it is denied that [Conemaugh] had any information prior to the surgery performed by Dr. Untracht on Earl Esherick on November 22, 2002, that would have warranted a suspension or other action with regard to the privileges of Dr. Untracht." (Doc. No. 147, Ex. 6 - Conemaugh's Answer and New Matter to EE Complaint).

Plaintiff's contention, that Conemaugh should be judicially estopped as a result of its September 7, 2004 Answer in the Malpractice Case and the position it took in the March 10, 2005 arbitration proceeding that it was not negligent in credentialing Plaintiff through November 22, 2002, makes no sense. (Doc. No. 147, p. 16). First, Plaintiff never adequately explains what Conemaugh should be judicially estopped from asserting. Presumably he wants to bind Conemaugh to its denial of the allegation that Conemaugh was negligent in credentialing Plaintiff. To begin, whether Conemaugh was negligent in credentialing Plaintiff between 1995 and November 22, 2002 is simply not an issue in the case *sub judice*. Furthermore, whether Conemaugh was negligent in credentialing Plaintiff between 1995 and November 22, 2002 is not an issue to which the doctrine of judicial estoppel is applicable.

The doctrine of judicial estoppel prevents a litigant from asserting a position that is inconsistent with one previously taken before a court or agency. *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 361 (3d Cir. 1996). Application of the doctrine involves a three-part test: 1) whether

the party's present position is irrevocably inconsistent with the position it asserted in the prior proceeding; 2) whether the party changed its position in bad faith; and 3) whether the use of judicial estoppel is tailored to address the affront to the court's authority or integrity. *Dam Things From Denmark; a/k/a Troll Company's ApS v. Russ Berrie & Co. Inc.*, 290 F.3d 548, 559 n. 15 (3d Cir. 2002).

Here, the basic requirement of inconsistency is not satisfied because there is nothing inconsistent between Conemaugh's defense in its Answer in the Malpractice Case or in the March 10, 2005 arbitration proceeding that it was not negligent in credentialing Plaintiff between 1995 and November 22, 2002 and Plaintiff's removal from Conemaugh's medical staff subsequent to November 22, 2002. Additionally, the fact that Conemaugh took a position in the March 10, 2005 arbitration of the Malpractice Case that it had not been negligent in credentialing Plaintiff between 1995 and November 22, 2002 has absolutely nothing whatsoever to do with the issue of whether Plaintiff was negligent in his treatment of EE, an 85-year old patient, on November 22, 2002. Furthermore, Conemaugh's position that it was not negligent in credentialing Plaintiff between 1995 and November 22, 2002 has absolutely nothing whatsoever to do with whether he acted unprofessionally in accusing others of negligence.

Conemaugh's assertion that it acted properly when it initially credentialed Plaintiff does not constitute an admission by Conemaugh that Plaintiff acted properly thereafter. Therefore, it is not inconsistent for Conemaugh to assert Plaintiff acted improperly, whether negligently or unprofessionally, on or after November 22, 2002. Since there is no irreconcilable inconsistency, the doctrine of judicial estoppel is not applicable.

Additionally, there is no evidence that Conemaugh's assertions were accepted or adopted by any

court in the course of the litigation so as to evidence bad faith on the part of Conemaugh for deviating from those assertions. *Id.* (citing *Cleveland v. Policy Management Systems Corp.*, 526 U.S. 795, 119 S.Ct. 1597, 143 L.Ed.2d 966 (1999)). Finally, judicial estoppel is an extraordinary remedy that should be used only when a party's inconsistent behavior would result in a miscarriage of justice. *See Dam Things*, 290 F.3d at 559-60. Plaintiff makes no argument regarding how failing to apply judicial estoppel in the case *sub judice* would result in a miscarriage of justice.

Second, Plaintiff asserts the March 10, 2005 arbitration result is entitled to collateral estoppel effect. (Doc. No. 147, pp. 20, 23). Plaintiff is incorrect in his assertion, the March 10, 2005 arbitration result is not entitled to collateral estoppel effect. Collateral estoppel requires that the following four factors be met: 1) the identical issue was previously adjudicated; 2) the issue was actually litigated; 3) the previous determination was necessary to the decision; and 4) the party precluded from relitigating the issue was fully represented in the prior action. *Raytech Corp. v. White*, 54 F.3d 187, 190 (3d Cir. 1995).

Although the issue of Plaintiff's negligence was likely at the forefront of the matters litigated in the arbitration proceeding, Judge Murphy did not offer any explanation as to why he reached the decision he did. (Doc. No. 147, Ex. 9). Judge Murphy simply entered an award in favor of the Malpractice Case defendants, which resulted in the Malpractice Case plaintiff receiving the "low" end of the high-low arbitration, in the amount of $375,000. (Doc. No. 147, Ex. 9).

In short, Plaintiff requests that the Court declare *res judicata* "Judge Murphy's finding that Plaintiff did not mismanage the care of Patient EE." (Doc. No. 146, p. 4). Plaintiff blatantly misrepresents to the Court the arbitration Judge's "holding" on this issue. Plaintiff interprets a

26

judgment against him in the amount of $375,000 to mean that Judge Murphy made a "finding" that he did not mismanage the care of EE. No such finding was made. The reasoning behind Judge Murphy's decision to award Plaintiff $375,000, the low side of the high-low binding arbitration is not disclosed by Judge Murphy. (Doc. No. 147, Ex. 9). Nowhere does Judge Murphy find, state or imply that Plaintiff did not mismanage the care of EE. (Doc No. 147, Ex. 9). The Court cannot and will not declare *res judicata* a finding that simply does not exist.

## B. ANTITRUST CLAIMS

### 1. Antitrust Standing

To prove antitrust standing a plaintiff must show that: 1) he has suffered the type of injury the antitrust laws were intended to prevent; and 2) the injury flows from that which makes the defendant's acts unlawful. *Gulfstream III Assocs., Inc. v. Gulfstream Aerospace Corp.*, 995 F.2d 425, 429 (3d Cir. 1993). The factors to be employed in a standing analysis include: 1) the causal connection between the antitrust violation and the harm to the plaintiff and the intent by the defendant to cause the harm, with neither factor alone conferring standing; 2) whether the plaintiff's alleged injury is of the type for which the antitrust laws were intended to provide redress; 3) the directness of the injury, which addresses the concerns that liberal application of standing principles might produce speculative claims; 4) the existence of more direct victims of the alleged antitrust violations; and 5) the potential for duplicative recovery or complex apportionment of damages. *Associated Gen. Contractors of Cal. v. California State Council of Carpenters*, 459 U.S. 519, 537-45, 103 S.Ct. 897, 74 L.Ed.2d 723 (1983).

"In addition to establishing that he has suffered an antitrust injury, the plaintiff must prove that he is the most efficient enforcer of the laws." *Baglio v. Baska*, 940 F.Supp. 819, 828 (W.D. Pa. 1996)

27

(citing *Alberta Gas Chem. v. E.I. DuPont Nemours & Co.*, 826 F.2d 1235, 1249 (3d Cir. 1987)).

"Antitrust standing goes beyond the Constitutional standing requirement of 'injury in fact' and is not

satisfied by the mere allegation of a causal connection between an alleged antitrust violation and harm

to the plaintiff." *Matthews v. Lancaster Gen. Hosp.*, 883 F. Supp. 1016, 1045 (E.D. Pa. 1995), *aff'd*,

87 F.3d 624 (3d Cir. 1996). "'An antitrust plaintiff must prove that the challenged conduct affected the

prices, quantity or quality of goods or services,' not just his own welfare." *Matthews*, 87 F.3d at 641

(quoting *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 728 (3d Cir. 1991)). Recovery by a

private plaintiff on an antitrust claim can only be had where the loss "stems from a competition-

reducing aspect or effect of the defendant's behavior." *Atlantic Richfield Co. v. USA Petroleum Co.*,

459 U.S. 328, 344, 110 S.Ct. 1884, 109 L.Ed.2d 333 (1990).

The Defendants argue that the Plaintiff lacks antitrust standing and, therefore, may not bring a

claim under the Sherman Act. (Doc. No. 137, pp. 44-46; Doc. No. 152, pp. 9-11; Doc. No. 161, p. 4;

Doc. No. 162 , p. 5). The Plaintiff cites *Angelico v. Lehigh Valley Hosp., Inc.*, 184 F.3d 268 (3d Cir.

1999) to argue that he has antitrust standing suggesting that his circumstances are comparable to Dr.

Angelico's. The Court does not agree.

To begin, in *Angelico*, with regard to the first element, the Third Circuit assumed that Dr.

"Angelico's allegation that the defendants acted in concert and with anticompetitive motive, i.e.,

conspired [was] true...[and his] harm clearly resulted from the conspiracy that prevented him from

competing in the market and thereby earning a living." *Angelico*,184 F.3d at 274. This Court will make

no such assumption in the case *sub judice.* Other than bare allegations, Plaintiff offers no evidence of

a conspiracy, an essential part of an antitrust violation, between any of the Defendants. In fact, Plaintiff

28

offers evidence to the Court that disproves a conspiracy. First, Plaintiff offers evidence that while the adverse actions were being taken against him at Lee he notified Conemaugh and Windber and that, upon review, each hospital renewed his clinical privileges multiple times. (Doc. 147, Ex. 1- Pl. Aff., ¶ 22, 23, 24, 31). According to Plaintiff's own evidence, after being put on notice of the adverse actions taking place at Lee, Conemaugh and Windber renewed Plaintiff's clinical staff privileges in 2000 and in 2002. *Id.* Furthermore, Plaintiff's evidence establishes that Conemaugh only began adverse action against Plaintiff following the death of EE, one of Plaintiff's patients at Conemaugh, more than three years after Plaintiff's problems at Lee arose. *Id*. at ¶ 25. Finally, Plaintiff admits he never suffered adverse action at Windber and, in fact, voluntarily resigned from Windber. (Doc. 147, Ex. 1- Pl. Aff. ¶ 60; Ex. B - Pl. Depo., p. 52 lines 10-16).

The evidence provided by Plaintiff demonstrates that Lee and Conemaugh were not acting in concert, *i.e.*, conspiring, but were actually acting quite independently. As a result, the Court finds that Plaintiff fails to raise a genuine issue of material fact with respect to whether Defendants Lee and Conemaugh acted in concert and with an anticompetitive motive, *i.e.*, conspired. Therefore, Plaintiff does not raise a genuine issue of material fact on the first element of antitrust standing, that his alleged harm clearly resulted from a conspiracy to prevent him from competing in the market.

Additionally, the Third Circuit found in *Angelico*, when addressing whether Dr. Angelico's injury was of the type the antitrust laws were meant to redress, that the injury Dr. Angelico suffered was being shut out of competition for anticompetitive reasons and that such an injury was among those the antitrust laws intended to prevent. *Angelico*, 184 F.3d at 274 (emphasis added). Likewise, in *Brader v. Allegeheny Gen. Hosp.*, 64 F.3d 869 (3d Cir. 1995), the other case cited by Plaintiff in an attempt to

29

support his position that he has antitrust standing, the Third Circuit held that Brader had suffered the type of injury the antitrust laws intended to protect because he had been completely shut out of the market by a purported group boycott. *Id.* at 877 (emphasis added).

In stark contrast, Plaintiff did not suffer the injury of being shut out of competition in the market. Although Plaintiff's privileges at both Lee and Conemaugh were eventually revoked Plaintiff had privileges at Windber[11] which were not revoked or restricted and which he admits he voluntarily resigned. (Doc. 147, Ex. 1 - Pl. Aff. ¶ 60; Ex. B - Pl. Depo., p. 52, lines 10-16). Thus, Plaintiff was not, in fact, shut out from competing in the market by Defendants' actions. Rather, Plaintiff had an active avenue of competition, his staff privileges at Windber, that he chose to voluntarily foreclose. The Court finds that voluntary foreclosure of one's own opportunities for competition is not the type of antitrust injury for which the antitrust laws were designed to provide redress.

Therefore, for the reasons set forth above, the Court finds that Plaintiff lacks antitrust standing and may not bring a claim under the Sherman Act. Accordingly, summary judgment is granted in favor of all Defendants on Plaintiff's Sherman Act § 1 and § 2 claims.

---

[11]Although the relevant geographic market was not well defined by the parties, the Court notes that at a bare minimum it includes, as Plaintiff asserts, the Johnstown area which encompasses the Windber Hospital located just eight miles from Conemaugh and ten miles from Lee. Mapquest, http://www.mapquest.com, (last visited July 27, 2006); *See Gordon*, 272 F.Supp.2d at 429 n.34 (holding a court may take judicial notice of driving distances disclosed on an Internet mapping service and identifying like facilities within a 36 mile driving distance); *see also, e.g., Urdinaran v. Aarons*, 115 F.Supp.2d 484, 490 (D.N.J. 2000) (the relevant geographic market may include Philadelphia, approximately a one hour drive from Atlantic City Hospital at which Plaintiff practiced); *Korshin v. Benedictine Hosp.*, 34 F.Supp.2d 133 (N.D.N.Y. 1999) (31 miles) (citing *BCP Anesthesia Care, Ltd. v. Passavant Memorial Area Hosp. Assoc.*, 36 F.3d 664 (7th Cir. 1994) (25 miles)). The Court notes that when Plaintiff moved to Johnstown he acquired privileges at Lee, Conemaugh and Windber in rapid succession further supporting the Court's determination that, at a minimum, these three hospitals are part of the relevant geographic market. (Doc. No. 147, Ex. 1 - Pl. Aff. ¶¶ 20, 22, 25, 29). The Court notes that this is the narrowest possible relevant geographic market and that one could easily argue the relevant geographic market includes surrounding areas such as Greensburg, Indiana, Somerset and even Pittsburgh.

## 2.    Sherman Act § 1

Even if Plaintiff had antitrust standing, summary judgment is appropriate on his Sherman Act § 1 claim. Section 1 of the Sherman Act provides that every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal. 15 U.S.C. § 1. To establish a violation of § 1, a plaintiff must prove: 1) concerted action by the defendants; 2) that produced anti-competitive effects within the relevant product and geographic markets; 3) that the concerted actions were illegal; and 4) that he was injured as a proximate result of the concerted action. *Gordon v. Lewiston Hosp.*, 423 F.3d 184, 207 (3d Cir. 2005) (citing *Petruzzi's IGA Supermarkets, Inc. v. Darling-Delaware Co.*, 998 F.2d 1224, 1229 (3d Cir. 1993)). Absent proof of all of these elements, a Sherman Act § 1 claim cannot be maintained. *Id.*

### a.    *Concerted Action*

The essence of a § 1 claim is the existence of an agreement. *Alvord-Polk, Inc. v. F. Schumacher & Co.*, 37 F.3d 996, 999 (3d Cir. 1994). "For a section 1 claim, 'a plaintiff must prove concerted action, a collective reference to the contract...combination or conspiracy.'" *Matthews*, 87 F.3d at 639 (quoting *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1131 (3d Cir. 1995)). A "'unity of purpose or a common design and understanding or a meeting of the minds in an unlawful arrangement' must exist to trigger section 1 liability." *Matthews*, 87 F.3d at 639 (quoting *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752, 771, 104 S.Ct. 2731, 81 L.Ed.2d 628 (1984)). Unilateral action simply does not support liability no matter what the motivation. *Matthews*, 87 F.3d at 639 (citations omitted). "Concerted action is established where two or more distinct entities have agreed to take action against the plaintiff." *Gordon*, 423 F.3d at 207. "Accordingly, it requires proof of a

31

causal relationship between pressure from one conspirator and an anticompetitive decision of another conspirator." *Id.*

A non-movant's burden in defending against a summary judgment motion in an antitrust case is no different than in any other case. *In re Flat Glass*, 385 F.3d at 357-58. "When the question involves concerted action, the non-movant may rely solely on circumstantial evidence and the reasonable inferences drawn therefrom to withstand summary judgment." *Gordon*, 423 F.3d at 208 (citing *In re Flat Glass Antitrust Litig.*, 385 F.3d 350, 357-58 (3d Cir. 2004)). "Significantly, however, 'antitrust law limits the range of permissible inferences' that can be drawn 'from ambiguous evidence.'" *Harrison Aire, Inc. v. Aerostar Int'l, Inc.*, 423 F.3d 374, 380 (3d Cir. 2005) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588, 106 S.Ct. 1348, 89 L.Ed.2d 538)). "To avoid deterring pro-competitive behavior, 'certain inferences may not be drawn from circumstantial evidence in an antitrust case.'" *Harrison*, 423 F.3d at 380 (quoting *InterVest, Inc. v. Bloomberg, L.P.*, 340 F.3d 144, 160 (3d Cir. 2003)). Mere complaints of concerted action simply are not enough. *Gordon*, 423 F.3d at 208. "There must be evidence that tends to exclude the possibility of independent action, meaning that the evidence reasonably tends to prove that the alleged conspirators had a conscious commitment to a common scheme designed to achieve an unlawful objective." *Id.* (citations omitted); *see Matsushita*, 475 U.S. at 590. "Evidence of conduct that is as consistent with permissible competition as with illegal conspiracy, without more, will not support an inference of conspiracy." *Id.* (citations omitted). The reasoning behind this is that mistaken inferences in this context might result in chilling the exact conduct the antitrust laws are designed to protect. *Alvord-Polk*, 37 F.3d at 1001 (citing *Matsushita*, 475 U.S. at 594, 106 S.Ct. 1348, 89 L.Ed.2d 538).

32

To survive a motion for summary judgment a plaintiff must present evidence that tends to exclude the possibilty that the alleged conspirators acted independently. *Matsushita*, 475 U.S. at 588, 106 S.Ct. 1348, 89 L.Ed.2d 538 (citations omitted). Furthermore, in order to survive a motion for summary judgment a plaintiff must produce economically plausible evidence supporting the elements of his claim. *Harrison*, 423 F.3d at 380  (citing *Matsushita*, 475 U.S. at 588, 106 S.Ct. 1348, 89 L.Ed.2d 538). "If the plaintiff's theory is economically senseless, no reasonable jury could find in [his] favor, and summary judgment should be granted." *Eastman Kodak Co. v. Image Tech. Servs., Inc.*, 504 U.S. 451, 468-69, 112 S.Ct. 2072, 119 L.Ed.2d 265 (1992); *Harrison*, 423 F.3d at 380.

First, in the case *sub judice* Plaintiff simply provides nothing more than bald assertions of conspiracy between the doctors on staff at Lee and Lee; the doctors on staff at Conemaugh and Conemaugh; and Lee and Conemaugh.  Plaintiff's assertions basically amount to the following: "Through the presentation of incorrect peer review information as to the standard of care to their [] Boards, Defendants [] Lee and Conemaugh, the named Defendant physicians and hospital agent co-conspirators acquired a unity of purpose, common design and understanding, and a meeting of minds in an unlawful arrangement to exclude Plaintiff from the medical staffs to the public's detriment." (Doc. No. 133, p. 26, ¶ 121). More specifically, Plaintiff claims that they conspired to have him fired by: Lee having his 1998 reappointment withheld; Lee reviewing his past cases, where a pattern of excessive blood loss was apparent, and then alleging to its Credentials Committee that Plaintiff had poor surgical skills; Lee allegedly conducting a peer comparison profile the result of which, according to Plaintiff who has never seen the allegedly existing report, showed he was as good if not better than his peers but according to Plaintiff, Lee allegedly suppressed the report and asserted no such report was

33

ever prepared; Lee allegedly turning the Executive Committee into a hearsay forum and not allowing

Plaintiff to defend himself (an allegation Plaintiff makes in the face of clear evidence that over 13 ½

months 19 hearings that culminated in 3000 pages of transcript were held, in which Plaintiff was given

a forum to defend himself); after problems with Plaintiff's performance were recognized, Lee obtaining

Dr. Benz to review Plaintiff's cases allegedly "pursuant to standards different than those applicable to

his peer group"; Lee allegedly implementing new Medical Staff Bylaws in January 2000 specifically

to prejudice Plaintiff; Lee allegedly earmarking faulty surgical equipment for Plaintiff's exclusive use

that it knew or should have known was likely to cause fatal complications to Plaintiff's patient; Lee

allegedly through Dr. Fritz soliciting Conemaugh through Dr. Saluzzo and Dr. Weygandt to revoke

Plainitff's staff privileges in 2001; Lee allegedly requesting Conemaugh and Windber to reverse their

favorable policies toward Plaintiff "as *quid pro quo* for [] Conemaugh to acquire [] Lee"; and the

Conemaugh doctors allegedly conspiring to have him fired following EE's death. (Doc. No. 133, pp.

8-13; 16-19).

    Plaintiff provides no evidence to substantiate these allegations. These mere complaints of

concerted action simply are not enough. First, the actions of the doctors on staff at Lee who suggested

peer review and those who participated in the peer review process and the subsequent action of Lee, in

undertaking peer review in an effort to curtail risk and potential loss of life to its patients, fail to

demonstrate that there was a conscious commitment by the medical staff to coerce Lee into accepting

its recommendation and, therefore, does not exclude the possibility that Lee acted independently in its

peer review activities. *See Gordon*, 423 F.3d at 209 (affirming grant of summary judgment where

doctor did not raise a genuine issue of material fact that other doctors coerced the hospital into revoking

34

his staff privileges and there was no evidence to exclude the possibility that the hospital acted independently in undertaking progressive peer review, thus precluding an inference of antitrust conspiracy). Likewise, the actions of the doctors at Conemaugh in suggesting peer review following the death of EE, the participation of other doctors in the peer review process and the subsequent action of Conemaugh in undertaking peer review and making a recommendation, fail to demonstrate that there was a conscious commitment by the medical staff to coerce Conemaugh into accepting its recommendation and, therefore, does not exclude the possibility that Conemaugh acted independently in its peer review activities. *See Gordon*, 423 F.3d at 209 (quoting *Matthews*, 87 F.3d at 639-40 ("[s]imply making a peer review recommendation does not prove the existence of a conspiracy [among the hospital and its staff]; there must be something more such as a conscious commitment by medical staff to coerce the hospital into accepting its recommendation[]"). "[] [P]eer review actions, when properly conducted, generally enhance competition and improve the quality of medical care." *Id.* (citing *Matthews*, 87 F.3d at 640).

Finally, Plaintiff sets forth absolutely no evidence of concerted action between Lee and Conemaugh. In fact, Plaintiff provides evidence to the Court that demonstrates an utter lack of conspiracy between Lee and Conemaugh. Lee undertook its peer review actions more than three years before Conemaugh began its peer review actions against Plaintiff. (Doc. No. 133, p. 10, ¶ 46). Plaintiff, in his affidavit, states that he informed Conemaugh of the adverse actions being taken against him at Lee and that after fully reviewing this information Conemaugh reappointed him in 2000 and 2002. (Doc. No. 147, Ex. 1 - Pl. Aff., ¶¶ 22, 23, 31). Furthermore, Plaintiff states that adverse action by Conemaugh did not begin until November [22], 2002 and was the direct result of the death of one

of Plaintiff's patients. (Doc. No. 147, Ex. 1 - Pl. Aff., ¶ 25). Finally, Plaintiff presents absolutely no evidence to support his allegation that Lee required Conemaugh to get rid of Plaintiff as a "*quid pro quo*" for Lee acquiring Conemaugh.

The evidence provided by Plaintiff demonstrates that Lee and Conemaugh were not undertaking concerted action with a unity of purpose or a common design and understanding or meeting of the minds, but rather were acting independently and in response to specific occurrences at their respective hospitals. *See Gordon*, 423 F.3d at 208 ("The whole of the evidence simply does not exclude the possibility that the Hospital acted independently in undertaking its professional review actions[]"). As a result, the Court finds that Plaintiff fails to establish a genuine issue of material fact that either the doctors on staff at Lee or the doctors on staff at Conemaugh coerced their respective hospitals into revoking his privileges or that Lee and Conemaugh engaged in concerted activity coercing the other hospital to revoke Plaintiff's privileges. Accordingly, the Court finds that, even if the Plaintiff had antitrust standing, all Defendants are entitled to summary judgment on Plaintiff's Sherman Act § 1 claim based on Plaintiff's failure to raise a genuine issue of material fact on the issue of concerted activity or conspiracy. Additionally, given that the Court finds no evidence of concerted action on the record, no genuine issue of material fact exists on the third element of a Sherman Act § 1 claim, whether or not those concerted actions were illegal.

           b.    *Anticompetitive Effects Within the Relevant Geographic and Product Market*

The second element, anticompetitive effects within the relevant geographic and product market, may be proven in two ways:

> "The plaintiff may satisfy this burden by proving the existence of actual

36

anticompetitive effects, such as reduction of output, increase in price, or deterioration in quality of goods and services. Due to the difficulty of isolating the market effects of the challenged conduct, however, such proof is often impossible to make. Accordingly, the Courts allow proof of the defendant's 'market power' instead. Market power - the ability to raise prices above those that would prevail in a competitive market - is essentially a 'surrogate for detrimental effects.'" *Angelico*, 184 F.3d at 276 (citing *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1367 (3d Cir. 1996)).

Plaintiff asserts that the relevant geographic market is the Johnstown area. (Doc. No. 147, p. 51). The Court finds that at an absolute minimum the relevant geographic market is the Johnstown area which includes Lee, Conemaugh and Windber. The relevant product market is not defined by either party, but seems to the Court to be general surgery.

Although Plaintiff makes numerous allegations Plaintiff provided no actual evidence showing anticompetitive effects in the Johnstown area as a result of the peer review actions taken at Lee beginning in about 1999 and at Conemaugh beginning in November of 2002. Furthermore, according to Plaintiff's evidence, he retained privileges at Windber where no adverse actions were taken against him. (Doc. No. 147, Pl. Aff. ¶¶ 61, 62). Thus, Plaintiff remained competitive in the relevant geographic and product market. Plaintiff elected to resign his privileges at Windber thereby voluntarily removing himself from the relevant geographic and product market. (Doc. No. 147, Ex. 1 - Pl. Aff. ¶ 60; Ex. B - Pl. Depo., p. 52 lines, 10-16). Essentially, therefore, Plaintiff's voluntary choice to resign his privileges at Windber ultimately created the anticompetitive effects, if any, on the market. Prior to his voluntary resignation, Plaintiff could have continued to compete and treat patients in the relevant geographic and product market. Therefore, Plaintiff fails to meet his burden of creating a genuine issue

37

of material fact on the second element of a Sherman Act § 1 claim, that the concerted action[12] resulted in anticompetitive effects in the relevant geographic and product market. Accordingly, even if Plaintiff had standing to bring an antitrust claim, the Court finds summary judgment in favor of the Defendants on Plaintiff's Sherman Act § 1 claim is proper.

c.    *Plaintiff Suffered Antitrust Injury as Result of Concerted Action*

The fourth element of a Sherman Act § 1 claim requires Plaintiff to prove he was injured as a proximate result of the concerted action.[13] *Gordon*, 423 F.3d at 207 (citations omitted). In antitrust cases, a plaintiff must prove "injury of the type the antitrust laws were intended to prevent and that flows from that which makes the defendants' acts unlawful." *Alberta Gas Chemicals Ltd. v. E.I. du Pont de Nemours & Co.*, 826 F.2d 1235, 1240 (3d Cir. 1987) (quoting *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 50 L.Ed.2d 701 (1977)). In other words, since "antitrust law aims to protect competition, not competitors, [a court] must analyze the antitrust injury question from the viewpoint of the consumer." *Id.* at 1241. "'An antitrust plaintiff must prove that [the] challenged conduct affected the prices, quantity or quality of goods or services,'" not just his own welfare." *Matthews*, 87 F.3d at 641 (quoting *Tunis Bros. Co., Inc. v. Ford Motor Co.*, 952 F.2d 715, 728 (3d Cir. 1991)).

As discussed earlier, the actions of Defendants did not foreclose Plaintiff from competing in the relevant market, in that he retained privileges at Windber, located no further than ten miles from Lee

---

[12] The Court notes that as discussed in detail in subsection (a) of this section Plaintiff also fails to create a genuine issue of material fact regarding concerted action among the Defendants.

[13] Again, the Court notes that as discussed in detail in subsection (a) of this section Plaintiff also fails to create a genuine issue of material fact regarding concerted action among the Defendants.

38

and Conemaugh. (Doc. No. 141, Ex. B - Pl. Depo., p. 52, lines 10-16); Mapquest, http://www.mapquest.com (last visited July 27, 2006); *See Gordon*, 272 F.Supp.2d at 429 n.34 (holding a court may take judicial notice of driving distances disclosed on an Internet mapping service and identifying like facilities within a 36 mile driving distance); *see also, e.g., Urdinaran v. Aarons*, 115 F.Supp.2d 484, 490 (D.N.J. 2000) (the relevant geographic market may include Philadelphia, approximately a one hour drive from Atlantic City Hospital at which Plaintiff practiced); *Korshin v. Benedictine Hosp.*, 34 F.Supp.2d 133 (N.D.N.Y. 1999) (31 miles) (citing *BCP Anesthesia Care, Ltd. v. Passavant Memorial Area Hosp. Assoc.*, 36 F.3d 664 (7th Cir. 1994) (25 miles)). Plaintiff admits in his affidavit and his deposition that he voluntarily resigned from Windber when he was not subject to any adverse actions and had not experienced any problems there. (Doc. No. 147, Ex. 1 - Pl. Aff. ¶¶ 61, 62; Doc. No. 141, Ex. B - Pl. Depo., p. 52, lines 10-16). Plaintiff voluntarily withdrew himself from the market. Prior to Plaintiff's voluntary withdraw from the market, consumers had the same goods and services (an option for surgery performed by Plaintiff) available to them in the market as they had before the peer review actions taken by Lee and Conemaugh. Voluntary withdraw from the relevant market is simply not the type of injury that the antitrust law is meant to protect.

Therefore, even if Plaintiff had standing to bring an antitrust claim, the Court finds Plaintiff fails to establish a genuine issue of material fact regarding the fourth element of his Sherman Act § 1 claim, that he suffered an antitrust injury as a result of Defendants' actions and that the Defendants are entitled to judgment as a matter of law. Accordingly, summary judgment in favor of Defendants on this issue is proper. *See Matthews*, 87 F.3d at 641 (affirming district court's grant of summary judgment where district court found the evidence did not support the existence of an antitrust injury resulting from a

39

restriction on Dr. Matthews's privileges at Lancaster General because orthopedic services were still readily available to consumers in the area; the district court also pointed out that the Board's restrictions on Dr. Matthews privileges did not completely extinguish Dr. Matthews' ability to provide services, but merely curtailed his ability to perform spine surgery at Lancaster General)(emphasis added).

### 3.    Sherman Act § 2

Section 2 of the Sherman Act prohibits monopolization, attempts to monopolize and conspiracies to monopolize any part of interstate trade or commerce. 15 U.S.C. § 2. Plaintiff alleges a conspiracy to monopolize under § 2 of the Sherman Act. (Doc. 133, pp. 27-28, ¶¶ 126-130). Claims for conspiracy to monopolize under § 2 of the Sherman Act require evidence of a conspiracy. *Gordon v. Lancaster Hosp.*, 423 F.3d 184, 207 n. 16 (2005). In a conspiracy to monopolize claim under § 2 of the Sherman Act, the plaintiff must prove: 1) an agreement or understanding between two or more parties; 2) a specific intent to monopolize; and 3) overt acts in furtherance of the alleged conspiracy. *Robinson v. Magovern*, 521 F.Supp. 842, 892 (W.D. Pa. 1981).

Plaintiff alleges that there was a § 2 violation because the doctors and hospitals conspired to end his surgical career. (Doc. No. 133, pp. 27-28, ¶¶ 126-130). As fully discussed previously, Plaintiff has failed to establish a genuine issue of material fact regarding an agreement between any of the Defendants.

Next, Plaintiff states that "[Lee and Conemaugh's] intent to monopolize through buyout is not pled as illegal by the Plaintiff, rather he pleads that his exclusion from the market as a condition precedent to said buyout, or at least associated with the buyout, is illegal and a violation of federal antitrust laws as pled." (Doc. No. 147, p. 54). Plaintiff clearly indicates that he is not alleging the

40

merger between Lee and Conemaugh is illegal. Plaintiff pleads that his exclusion from the market as a condition precedent to the buyout is a violation of § 2 of the Sherman Act. Plaintiff believes that Lee required Conemaugh to get rid of Plaintiff as a "*quid pro quo*" for Conemaugh acquiring Lee. (Doc. No. 133, p. 17, ¶ 78). Plaintiff provides not one iota of evidence that a condition precedent to the merger between Lee and Conemaugh was that Conemaugh get rid of Plaintiff. The allegation borders on the absurd, in that it requires acceptance of the circumstance that the exclusion of Plaintiff from the market was an essential factor in completing a merger of two major hospitals, and the Court will address it no further than to say absolutely no evidence was provided to support this allegation. Without evidence, no genuine issue of material fact exists.

Therefore, even if the Plaintiff had standing to bring an antitrust claim, the Court finds Plaintiff has not established a genuine issue of material fact on his claim of conspiracy to monopolize under § 2 of the Sherman Act and the Defendants are entitled to judgment as a matter of law. Accordingly, the Court finds summary judgment in favor of the Defendants is proper on Plaintiff's Sherman Act § 2 claim.

**B.     §1983 CLAIM**

Plaintiff brings a claim for violation of 42 U.S.C. § 1983 against UPMC, Lee, Conemaugh, Dr. Kolff, Dr. Saluzzo, Dr. Ergas, Dr. Fikri, Dr. Fiorica, Dr. Benz, Dr. Slater, Dr. Carney and Ms. Weisbrodt (hereinafter sometimes referred to as "the § 1983 Defendants"). Section 1983 provides a cause of action for "any person who has been deprived of rights secured by the Constitution or laws of the United States by a person acting under color of state law." *Curley v. Klem*, 298 F.3d 271, 277 (3d Cir. 2002). To recover under § 1983, a plaintiff must establish: 1) that the conduct complained of was

41

committed by a person acting under color of state law; and 2) that as a result of this conduct plaintiff

was deprived of rights, privileges or immunities secured by the Constitution or the laws of the United

States.[14] *West v. Atkins*, 487 U.S 42, 48, 108 S.Ct. 2250, 101 L.Ed.2d 40; *Parratt v. Taylor*, 451 U.S.

527, 535, 101 S.Ct. 1908, 68 L.Ed.2d 420 (1981), *overruled on other grounds*, *Daniels v. Williams*, 474

U.S. 327, 106 S.Ct. 662, 88 L.Ed.2d 662 (1986). To satisfy the state action requirement under § 1983,

a plaintiff must prove that the alleged violations are "fairly attributable to the state" and courts require

careful adherence to the state action requirement because it "preserves an area of individual freedom

by limiting the reach of federal law and federal judicial powers." *Lugar v. Edmondson Oil Co., Inc.*,

457 U.S. 922, 936, 102 S.Ct. 2744, 73 L.Ed.2d 482 (1982).

A plaintiff bringing a civil rights claim for damages under § 1983 must demonstrate that the

defendant was a person acting under color of state law. If the record does not reflect that the defendant

acted under color of state law when engaged in the alleged misconduct, a claim for violation of civil

rights under § 1983 must fail as a matter of jurisdiction and there is no need for the court then to

determine whether a federal right has been violated. *Polk County v. Dodson*, 454 U.S. 312, 315, 102

S.Ct. 445, 70 L.Ed. 2d 509 (1981), *Rendell-Baker v. Kohn*, 457 U.S. 830, 838, 102 S.Ct. 2764, 73

L.Ed.2d 418 (1982).

State action is shown if: 1) the deprivation of federal rights was caused by the exercise of some

---

[14]Plaintiff alleges that the § 1983 Defendants acted under color of state law while exercising their peer review responsibility pursuant to federal law (HCQIA) and the fourteenth amendment of the United States Constitution. (Doc. No. 133, pp. 20-21, ¶ 99). Plaintiff argues he was denied free speech, due process and equal protection through the § 1983 Defendants' "deliberate indifference to fundamental Constitutional due process and the HCQIA immunity provisions enumerated at 42 U.S.C. § 11112(a). *Id.* at ¶ 100. However, the Court finds that Plaintiff fails to create a genuine issue of material fact that any of the § 1983 Defendants are state actors and, therefore, does not reach the second element of this claim.

right or privilege created by the state or by a person for whom the state is responsible; and 2) the party charged with the deprivation was a person who may fairly be said to be a state actor. *Lugar*, 457 U.S. at 937. Under this test, liability attaches to those wrongdoers who "carry a badge of authority of a [s]tate and represent it in some capacity." *National Collegiate Athletic Ass'n. v. Tarkanian*, 488 U.S. 179, 191, 109 S.Ct. 454, 102 L.Ed.2d 469 (1988).

No single method of analysis determines the presence of state action in § 1983 cases. *Krynicky v. Univ. of Pittsburgh*, 742 F.2d 94, 98 (3d Cir. 1984). Instead, the analysis depends on that facts and circumstances of each case. *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 722, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961). Regardless of the approach used, the heart of the inquiry is to discern if the defendant exercised power possessed by virtue of state law and made possible only because the wrongdoer is clothed with the authority of state law. *Groman v. Twp. of Manalapan*, 47 F.3d 628, 639 n. 17 (3d Cir. 1995).

The Supreme Court has suggested at least three separate tests to determine if the actions of a private person can fairly be attributable to the state: 1) the "close nexus" test, under which the court determines whether the state can be deemed responsible for the specific conduct at issue, *Jackson v. Metro. Edison Co.*, 419 U.S. 345, 351, 95 S.Ct. 449, 42 L.Ed.2d 477 (1974); 2) the "symbiotic relationship" test, in which the court examines the relationship of the parties to determine whether or not the state has "insinuated itself into a position of interdependence" with the alleged actor, so as to be considered a joint participant therein, *Burton*, 365 U.S. at 725; and 3) the "public function" test, under which the court inquires into whether the government is using a private party to engage in activities that were the exclusive prerogative of the state. *Rendell-Baker*, 457 U.S. at 841.

43

Plaintiff clearly indicates that he is not claiming the § 1983 Defendants engaged in activities that were the exclusive prerogative of the state. (Doc. No. 147, p. 25). Plaintiff does, however, claim that state action applies to the § 1983 Defendants under the symbiotic relationship and close nexus test. *Id.* at 26.

A symbiotic relationship exists where a state has so far insinuated itself into a position of interdepence with the actor that it must be recognized to be a joint participant in the challenged activity which, on that account, cannot be considered so "purely private" as to fall outside the scope of the Fourteenth Amendment. *Krynicky*, 742 F.2d at 98. A tenuous connection to state action does not convert a private action into one which is under color of state law. It is well established that the interdependence between the state and the private actor must be pronounced before the law will transform the private action into state action. *Groman*, 47 F.3d 641.

The close nexus test requires that a plaintiff demonstrate that there is a sufficiently close nexus between the government and the private party. The primary issue to be examined under the nexus test is not whether the state was involved in some manner in the relevant events, but whether there is a sufficiently close nexus between the state and the challenged action of the private party so that the action of the private party may be fairly attributable to the state. *Blum*, 457 U.S. at 1004; *Groman*, 47 F.3d at 638.

### 1.    UPMC and Lee

Plaintiff alleges Lee and UPMC are state actors. (Doc. No. 133, pp. 20-22, ¶¶ 98-106; Doc. No. 147, pp. 23-34). Lee and UPMC argue they are not state actors and there is insufficient evidence on the record to establish they are state actors. (Doc. No. 140, pp. 13-18). Therefore, Lee and UPMC argue,

they are not liable under § 1983 and are entitled to summary judgment in their favor on this issue. *Id.*

To begin, Plaintiff attempts to argue that Lee and UPMC are entwined in a "symbiotic relationship" with the Commonwealth or are state actors under the close nexus test. (Doc. No. 133, pp. 20-22, ¶¶ 98-106; Doc. No. 147, p. 26). However, review of the evidence of record and recent Third Circuit case law reveals Plaintiff does not raise a genuine issue of material fact sufficient to survive summary judgment on this issue.

First, in *Crissman v. Dover Downs Entm't, Inc.*, 289 F.3d 231 (3d Cir. 2002), the Third Circuit drastically limited the "symbiotic relationship" theory.[15] The Third Circuit held that the manager of the defendant's subsidiary corporation was not a state actor when he made the decision to exclude plaintiff from its facility that operated a racetrack and slot machines. *Id.* at 239. In reaching this conclusion, the Third Circuit held that it was essential to focus upon the specific conduct complained of and determine whether the state was responsible for it. *Id.* (citations omitted). The Third Circuit held there was no state action despite the following: 1) assuming that the State of Delaware had granted Dover Downs a six-month monopoly for harness racing; 2) the fact that a state Commission Rule required Dover Downs to "abide by and *enforce* the Act and the rules and orders of the Commission" (emphasis in original); 3) the fact that the state had benefitted from a video lottery operated at Dover Downs, owned or leased the slot machines and shared the profits; and 4) the fact that Dover Downs was not permitted to fill many positions in its organization without state approval. *Crissman*, 289 F.3d at 243, 246-47; *see also*

---

[15]The *Crissman* court expressly limited the reach of *Burton v. Wilmington Parking Auth.*, 365 U.S. 715, 81 S.Ct. 856, 6 L.Ed.2d 45 (1961), the case that created the symbiotic relationship test. *Id.* at 725. Noting the *Burton* involved a privately owned and racially segregated restaurant located in a public parking garage, the Third Circuit concluded that the symbiotic relationship was "crafted for the unique set of facts presented" and would not be expanded to apply beyond those facts. *Id.* at 242, 246.

*Berm v. Universal Health Sys., Inc.*, 371 F.3d 165, 172-73 (3d Cir. 2004) (holding that a mental healthcare facility did not become a state actor by acting pursuant to Pennsylvania's commitment procedures).

In addition, *Crissman* limited the relevance of *Braden v. Univ. of Pittsburgh*, 552 F.2d 948 (3d Cir. 1977) and *Krynicky v. Univ. of Pittsburgh*, 742 F.2d 94 (3d Cir. 1984), the cases that deemed the University of Pittsburgh to be a state actor under the symbiotic relationship test. 289 F.3d at 45 (recognizing that these cases were incorrect in concluding the *Burton* "remained a viable framework"). Central to the Third Circuit's decision in both *Braden* and *Krynicky* was the recognition that the Commonwealth had taken the affirmative step of statutorily accepting responsibility for the University by enacting the University of Pittsburgh-Commonwealth Act (hereinafter "University Act"), 24 P.S. § 2510-201 *et seq. See Crissman*, 289 F.3d at 245. The University Act, which clearly resulted from state action by the General Assembly and the Governor of Pennsylvania, established the "...University of Pittsburgh as an instrumentality of the Commonwealth..."; provided that twelve of the University's trustees be selected by the Commonwealth and that certain public officials serve as trustees ex officio; provided that the Commonwealth make annual appropriations to the University to be used as specified by the Commonwealth; authorized the Commonwealth to set up tuition and fee schedules for in-state students; and required that annual reports of all activities of the University be filed with the Governor and the General Assembly.

Similarly, the Third Circuit declined to apply *Krynicky* in *Boyle v. Governor's Veterans Outreach & Assistance Center*, 925 F.2d 71 (3d Cir. 1991) and instead held that the defendant's termination of the plaintiff's employment did not constitute state action even though: 1) the Governor

performed central planning, supervisory and administrative functions; 2) the defendant was required to submit audits and financial reports to the state; 3) the Commonwealth was committed to future funding of the defendant; 4) the relationship was created by statute; and 5) the defendant received free space in state office buildings. *Id.* at 76-77. In so holding, the *Boyle* court distinguished *Krynicky* by focusing on the fact that the University Act expressly made the University an instrumentality of the State and set up a system in which "the Commonwealth oversees virtually every aspect of the operation of the University." *Id.* at 76.

Unlike in *Crissman*, the Plaintiff in the case *sub judice* has not presented any evidence that the Commonwealth has given Lee or UPMC any kind of state monopoly, drawn any kind of profits from Lee or UPMC activities, or limited the ability of Lee or UPMC to hire employees. (*See* Doc. No. 147). Second, the University Act does not apply to Lee or UPMC, they are separate, independent corporations. (Doc. No. 142, Exhibit H - Jegasothy Aff. ¶¶ 6, 7). Lee and UPMC also are not controlled by each other and are not under common control. *Id.* At all times relevant to the case *sub judice* neither UPMC nor Lee has shared administrators or corporate officers with the University of Pittsburgh and both entities are managed and operated independently of the University of Pittsburgh. *Id.* at ¶ 6. There is no statute declaring Lee or UPMC to be an "instrumentality of the State," or designating it as "state-related." *Id.* at ¶ 8. Additionally, there is no statute providing for state appropriations to Lee or UPMC. *Id.* at ¶ 9. The Commonwealth does not specify how Lee or UPMC must utilize its operating funds, and UPMC and Lee are not required to file with the Commonwealth a statement setting forth the amounts and purposes of all expenditures made from its accounts. *Id.* at ¶¶ 10-12. Furthermore, the Commonwealth does not set statutory fees for patients in UPMC facilities

47

and neither Lee nor UPMC is statutorily required to submit annual reports of their activities to the Commonwealth. *Id.* at ¶¶ 13, 14.

Second, Plaintiff alleges that Lee and UPMC are "an integral component of the University of Pittsburgh, a state related university, of and through which UPMC is marketed alternatively as a state owned, sponsored and/or intimately affiliated entity which is linked to the University of Pittsburgh website." (Doc. No. 133, pp. 2-3, ¶¶ 5, 6). Plaintiff provides no evidence in support of these allegations.

On the other hand, UPMC and Lee provide evidence establishing that Lee and UPMC are distinct and separate entities from the University of Pittsburgh. (Doc. No. 142, Exhibit H - Jegasothy Aff. ¶ 6). UPMC and Lee point out that the University of Pittsburgh is not a defendant in the case *sub judice* and argue that Plaintiff has failed to set forth evidence that creates a genuine issue of material fact on the issue of there being a connection between UPMC or Lee and any state actor or state entity of a nature sufficient to cause their conduct to come within the definition of state action. (Doc. No. 142, pp. 13-18).

In *Steppling v. Presbyterian Univ. Hosp.*, Civil Action No. 94-401 (W.D. Pa. Nov. 14, 1995)(Ambrose, J.) the court faced the issue of whether Presbyterian University Hospital ("PUH"), UPMC's predecessor, was a state actor under § 1983 by virtue of its relationship with the University of Pittsburgh. The plaintiff relied on the fact that the University and PUH were parties to a master services agreement, whereby the University provided certain executive management services to PUH and that the specific decision or action being challenged was made by an employee of the University. *Id.* at 6-8. The plaintiff argued that PUH was a state actor under both the symbiotic relationship and

48

close nexus tests. *Id.* at 13. Rejecting the plaintiff's arguments, the court noted that there was insufficient evidence of a direct connection between the Commonwealth of Pennsylvania and PUH. *Id.* at 15. The court went on to explain that PUH's relationship to the University, a state actor, also failed to tie PUH to the Commonwealth in a way that permitted a finding of state action:

"[T]he relationship between the Commonwealth of Pennsylvania and the University of Pittsburgh, which qualifies the University of Pittsburgh as a state actor for purposes of 42 U.S.C. § 1983, is of a completely different nature than that of the University of Pittsburgh and PUH." *Id.* at 15. "...[N]o court appears to be willing to extend the applicability of § 1983 claims to cover situations where the symbiotic relationship is not between a private entity and a state but between a private entity that has been deemed a state actor for purposes of 42 U.S.C. § 1983 because of its relationship to a state and another private entity." *Id.* at 16.

As discussed earlier, Plaintiff has failed to provide evidence of a direct connection between the Commonwealth and Lee or UPMC of a level sufficient to render their actions state action. Furthermore, in accordance with the *Steppling* decision, the Court finds that the relationship between Lee and UPMC, private entities, and the University of Pittsburgh, a private entity that has been deemed a state actor, is of a completely different nature than the relationship between the Commonwealth, the state itself, and the University of Pittsburgh. This Court, like other courts, is not willing to extend the applicability of § 1983 claims to cover situations where the symbiotic relationship, if one even exists, is not between a private entity and a state actor but between a private entity that has been deemed a state actor by virtue of its relationship to a state and another private entity. The Court finds that Plaintiff has failed to provide evidence that creates a genuine issue of material fact regarding the issue of whether Lee and UPMC are state actors under the symbiotic relationship test or the close nexus test based on their relationship to the University of Pittsburgh.

49

Third, Plaintiff argues that a "nexus" between the University of Pittsburgh and Lee exists because the June 23, 2003 revocation of Plaintiff's clinical privileges was a joint action of Lee and the University of Pittsburgh. (Doc. No. 147, p. 33). This argument is based on his perception that the University of Pittsburgh ratified the revocation by placing its "seal" on the revocation letter and other correspondence related to the revocation of Plaintiff's clinical privileges. (Doc. No. 147, p. 33). Review of the revocation letter shows that what Plaintiff is referring to as the "seal" is, in fact, a reproduction of the emblem of the University of Pittsburgh that is located in the upper right hand corner of Lee's letterhead that indicates Lee is a hospital of the UPMC Health System. (Doc. No. 147, Ex. 15). This emblem that is incorporated into the letterhead is in no way a "seal" used by the University of Pittsburgh to ratify an action. There is absolutely no "seal" on the revocation letter demonstrating the University of Pittsburgh signed off on the revocation of Plaintiff's clinical privileges or was in any way involved in the proceedings. The Plaintiff's attempt at a play on the use of the word "seal" does not create a fact issue with regard to whether UPMC and Lee are state actors under the close nexus test. Therefore, the Court finds Plaintiff fails to raise a genuine issue of material fact regarding whether the UPMC and Lee were acting under color of state law with this argument.

Finally, Plaintiff argues that Judge Leahey is a state actor and when he entered an Order in Untracht I, lifting the preliminary injunction put in place at Plaintiff's request that prevented the Defendants from making a report to the National Practitioners Data Bank (hereinafter "NPDB"), these Defendants became state actors due to the relationship between the Judge and the litigant. (Document No. 147, pp. 28-33). Plaintiff argues that the Defendants improperly involved Judge Leahey before reporting Plaintiff to the NPDB because they had an independent statutory duty to report Plaintiff to the

50

NPDB. *Id.* at 28. This argument entirely ignores the facts at hand and the controlling case law.

First, Plaintiff is the one who involved the state when he filed three separate lawsuits in the Cambria County Court of Common Pleas. (Doc. No.142, Exs. A, B, C; Doc. No. 136, pp. 3-5). Defendants do not become state actors by virtue of being involved in a lawsuit filed by Plaintiff. *Tunstall v. Office of Judicial Support of the Court of Common Pleas of Delaware County*, 820 F.2d 631, 634 (3d Cir. 1987). Furthermore, Defendants' involvement in the lawsuits filed by Plaintiff does not create joint action with the state on the Defendants' part. *Id.* Although Defendants had a duty to report to the NPDB, they were prevented from doing so pursuant to a preliminary injunction obtained by Plaintiff. (Doc. No. 142, Ex. D). Defendants sought to have this injunction terminated and a hearing was scheduled. (Doc. No. 147, pp. 28-29). Plaintiff was on notice of the hearing, but elected voluntarily to leave the country. (Doc. No. 147, p. 30). Plaintiff now goes so far as to allege that the Court's holding of the scheduled hearing, of which he was on notice, in his voluntary absence was an *ex parte* communication with the Judge that creates a joint action between the Defendants and the state acting through Judge Leahey. (Doc. No. 147, pp. 30, 32).

In short, the action of lawfully seeking the revocation of a preliminary injunction put in place at the Plaintiff's request in order to comply with their statutory duty of reporting to the NPDB in no way makes the Defendants state actors subject to liability under § 1983. *Dennis v. Sparks*, 494 U.S. 24, 28, 101 S. Ct. 184, 66 L.Ed.2d 185 (1980) ("[o]f course, merely resorting to the courts and being on the winning side of a lawsuit does not make a party a [] joint actor with the judge). Additionally, the fact that Plaintiff chose to voluntarily leave the country prior to the time of the hearing that he knew was scheduled in a case he filed is neither the Judge's nor the Defendants' fault or problem. The Court finds

51

Plaintiff establishes no genuine issue of material fact with these allegations and presents no evidence connected to these allegation which raise any genuine issue of material fact regarding whether UPMC and Lee or any of the other § 1983 Defendants are state actors.

In light of the evidence on the record, the Court finds that Plaintiff has failed to provide evidence that creates a genuine issue of material fact regarding the issue of whether Lee and UPMC are state actors under the symbiotic relationship or close nexus test, and finds that the Defendants are entitled to judgment as a matter of law. Accordingly, summary judgment is granted in favor of the UPMC and Lee on Plaintiff's § 1983 claim.

### 2. Conemaugh

Similar to the argument Plaintiff makes regarding the UPMC Defendants and the University of Pittsburgh, Plaintiff alleges that Conemaugh heavily advertises its affiliation with Temple University (hereinafter referred to as "Temple") to benefit financially, attract patients and resident physicians, and that this affiliation makes Conemaugh a state actor under either the symbiotic relationship or close nexus test. (Doc. No. 133, p. 4, ¶ 10; Doc. No. 147, p. 26). Conemaugh alleges its affiliation with Temple does not make it a state actor. (Doc. No. 140, pp. 15-18). It is important to note that Plaintiff does not attempt to allege a direct relationship between the Commonwealth and Conemaugh. Rather, Plaintiff's argument is essentially that Conemaugh's affiliation with Temple, which has been held to be a state actor in some circumstances through its relationship to the Commonwealth, extends down another level and makes Conemaugh a state actor because it affiliates with Temple for certain things. (Doc. No. 133, pp. 20-22, ¶¶ 98-106).

Plaintiff attempts a bootstrap theory based on an alleged "affiliation" between Conemaugh and

52

another alleged state actor, Temple, to argue that Conemaugh is thereby a state actor. (Doc. No. 133, pp. 20-22, ¶¶ 98-106). Although Temple has been held to be a state actor, based on its participation in the Commonwealth System of Higher Education, *Krynicky*, 742 F.2d at 99,[16] Conemaugh's contractual relationship with Temple does not make it a state actor for purposes of § 1983. *Steppling*, CA. No. 94-401, 15-16 (W.D. Pa. 1995) ("to date no court appears willing to extend the applicability of § 1983 claims to cover situations where the symbiotic relationship is not between a private entity and the state but between a private entity that has been deemed to be a state actor...and another private entity[]"). The *Krynicky* court pointed out that the mere existence of a contractual relationship between a government entity and a private entity does not convert the private entity into a state actor for § 1983 purposes. *Id.* at 99-100 (citing *Rendell-Baker*, 457 U.S. at 841); *see also Crissman*, 289 F.3d 231 (3d Cir. 2002). Furthermore, existence of a contractual relationship between two private entities, one of which is a state actor is insufficient to make the second private entity a state actor for purposes of § 1983. *Steppling*, CA. No. 94-401, pp. 15-16.

Plaintiff offers no evidence to support the conclusion that the specific conduct at issue, revocation of his staff privileges, could be fairly attributed to the state. *See Crissman*, 289 F.3d at 239 (holding the state must be responsible for the specific conduct at issue in order for the action to be fairly attributable to the state). Plaintiff provides no evidence to describe the nature of the "affiliation" between Conemaugh and Temple. (*See* Doc. No. 147). Plaintiff also does not provide any evidence

_____

[16]*But see Commonwealth v. Downing*, 511 A.2d 792, 794-95(Pa. 1986) (holding that Temple is a private institution despite its designation as part of the Commonwealth system of higher education; *Carroll v. Temple University*, 1994 WL 590615 (E.D. Pa. 1994) (holding Temple's status as a federal depositary library does not transform it into a public institution).

53

that Temple owns or manages the hospital or that it had any involvement at all in the events leading up to the revocation of Plaintiff's staff privileges. (*See* Doc. No. 147). The decision to revoke Plaintiff's staff privileges was ultimately made by Conemaugh's Board of Directors. (Doc. No. 152, p. 7). There is neither an allegation, nor evidence of record, suggesting that Temple so controlled the Conemaugh Board that its actions were really actions of Temple University and, by extension, the State. (Doc. No. 152, p. 7).

In contrast, the evidence on the record before the Court shows that the Affiliation Agreement between Temple and Conemaugh does not create a relationship of such a level that it would transform Conemaugh's internal staffing decisions into actions that could in any way, let alone fairly, be attributable to Temple. Plaintiff's [sole basis] for claiming that Conemaugh should be considered a state actor is the fact that some of the individuals involved in the revocation of his staff privileges also held faculty appointments at Temple. (Doc. No. 137, Ex. B, Pl. Depo., pp. 117-124). As indicated in the affidavit of Steven Tucker, President of Conemaugh, Temple and Conemaugh entered into the Affiliation Agreement in July 1977 so that Temple students in the health professions could obtain practical experience working under the direction of Conemaugh's medical staff. (Doc. No. 137, Ex. A, Steven Tucker Aff., ¶ 3). The "affiliation" between Temple and Conemaugh is limited to offering mutual support for their respective educational and health services missions. (Doc. No. 137, Ex. A, Steven Tucker Aff., ¶ 4). The Affiliation Agreement specifically provides that Conemaugh retains complete control over its operations, the quality of patient care and appointments to the Conemaugh medical staff. (Document No. 137, Ex. A, Steven Tucker Aff., ¶ ¶ 4,5; Ex. A to Ex. B - Affl. Agmt. ¶ 1). Temple, on the other hand, retains ultimate responsibility for Temple's educational activities and

54

faculty appointments. (Doc. No. 140, Ex. A to Ex. B - Affl. Agmt. ¶ 2). Furthermore, the Affiliation Agreement also provides that neither party delegates to the other authority for making staff or faculty appointments to the other party. (Doc. No. 140, Ex. A to Ex. B - Affl. Agmt. ¶ 4). Finally, the Affiliation Agreement makes no provision for payment from Temple to Conemaugh and Conemaugh does not receive payment of any kind from Temple. (Doc. No. 140, Ex. A - Steven Tucker Aff. ¶ 6).

The Court finds that the evidence of record establishes that Conemaugh and Temple are totally independent with regard to their respective staff and faculty appointments. The Court finds no evidence in the record to establish anything to the contrary occurred with respect to the revocation of Plaintiff's staff privileges at Conemaugh. Additionally, the Court finds that the evidence on the record establishes that Temple had no right to control Conemaugh and Plaintiff provided no evidence establishing that Temple participated in the actions that resulted in the revocation of Plaintiff's staff privileges.[17] Since Conemaugh's actions in revoking Plaintiff's staff privileges are not attributable to Temple they cannot, therefore, be attributable to the state for purposes of § 1983. Accordingly, the Court finds that Plaintiff has failed to present sufficient evidence to raise a genuine issue of material fact regarding whether Conemaugh was a state actor and finds that Defendants are entitled to judgment as a matter of law; therefore, as a result, summary judgment is granted in favor of Conemaugh on Plaintiff's § 1983 claim.

### 3. Individual Doctor § 1983 Defendants

Plaintiff's only two allegations against the individual doctor defendants he sues under § 1983, listed as Dr. Kolff, Dr. Saluzzo, Dr. Duke, Dr. Ergas, Dr. Fikri, Dr. Fiorica, Dr. Benz, Dr. Slater, Dr.

---

[17]Although there were doctors on staff at Conemaugh that were clinical professors at Temple, Plaintiff provides no evidence showing that their actions related to the peer review at Conemuagh were undertaken in their capacities as clinical professors at Temple rather than in their capacities as doctors on staff at Conemaugh. (*See* Doc. No. 147).

Carney and Ms. Weisbrodt (hereinafter the "Individual Doctor Defendants") are that "...Ergas, Fiorica, Benz, Slater, Carney and Weisbrodt, individually made materially false statements under oath to adversely influence Defendant Lee's fair hearing regarding Plaintiff[,]" (Doc. No. 133, p. 22, ¶ 104), and that Dr. Benz's testimony regarding his recommendations after observing Plaintiff are equal to the University of Pittsburgh placing its seal of approval on Lee's decision because Dr. Benz is on the University of Pittsburgh teaching staff. (Doc. No. 147, p. 34). The Court interprets these allegations by Plaintiff to be an attempt to assert that the state was acting through the Individual Doctor Defendants because they are members of either the medical staffs at the University of Pittsburgh or Temple. Furthermore, the Court notes that despite naming Kolff, Saluzzo and Duke, Plaintiff makes no specific allegations against them.

The Court construes Plaintiff's claim to be that the Individual Doctor Defendants from Conemaugh should be considered state actors because some of these individuals involved in the revocation of his staff privileges also held faculty appointments at Temple. (Document No. 140, Ex. B, Pl. Depo., pp. 117-124). As discussed above, Temple and Conemaugh retain complete control over their appointments to faculty and medical staff respectively. (Doc. No. 140, Ex. A - Steven Tucker Aff., ¶¶ 4, 5). Additionally, the Court understands Plaintiff to be claiming that named Individual Doctor Defendants from Lee were state actors because they held positions as clinical professors at the University of Pittsburgh. (Doc. No. 133, p. 22, ¶ 104; Doc. No. 147, p. 34). With these assertions, Plaintiff is again attempting to argue that the affiliation between Lee and the University of Pittsburgh and the affiliation between Conemaugh and Temple creates state action on behalf of Lee, Conemaugh, and, in this instance, the Individual Doctor Defendants, because the University of Pittsburgh and

56

Temple have in some circumstances been held to be state actors by virtue of their relationship with the Commonwealth. The relationship between the Commonwealth and Lee, Conemaugh, or the Individual Doctor Defendants existing because of affiliations with the University of Pittsburgh or Temple is far too attenuated to hold state action on the part of Lee, Conemaugh or the individual Defendants. *See Steppling*, CA. No 94-401, 15-16 (W.D. Pa. 1995) ("to date no court appears willing to extend the applicability of § 1983 claims to cover situations where the symbiotic relationship is not between a private entity and the state but between a private entity that has been deemed to be a state actor...and another private entity[]").

Furthermore, regardless of whether the Individual Doctor Defendants against whom Plaintiff claims violations of § 1983 are clinical professors at either Temple or University of Pittsburgh, there is no evidence showing that any of them utilized power possessed by virtue of state law or their positions as clinical professors at either the University of Pittsburgh of Pittsburgh or Temple when they recommended and/or participated in peer review actions against Plaintiff as members of the medical staffs at their respective hospitals. (*See* Doc. No. 147). These actions had nothing to do with the University of Pittsburgh, Temple or the Individual Doctor Defendants' positions as clinical professors at either university. The evidence shows that the peer review actions were undertaken in response to specific incidents that occurred at each respective hospital. (Doc. No.155, Ex. A; Doc. No. 147, Ex. 1, Pl. Aff. ¶ 25). Plaintiff presents no evidence showing that the actions were undertaken at the behest of either university or in furtherance of the Individual Doctor Defendants positions as clinical professors at either university. (*See* Doc. No. 147). Plaintiff's allegations that these Individual Doctor Defendants hold positions as clinical professors at either university simply is not sufficient evidence to create an

issue of material fact on whether they were state actors. Plaintiff fails to meet his burden on the second element in a § 1983 claim, that there be state action with regard to the Individual Doctor Defendants. Accordingly, summary judgment in favor of the § 1983 Individual Doctor Defendants on Plaintiff's § 1983 claim is granted.

## C.    §1981 CLAIM

Plaintiff makes a claim under 42 U.S.C. § 1981 for the first time in his Second Amended Complaint. (Doc. No. 133, pp. 23-24, ¶¶ 107-113). Plaintiff asserts that revocation of his staff privileges: 1) constituted a "retaliatory constructive discharge" from the Defendants' medical staffs because of his "whistleblower activities;" and 2) that he was the victim of "reverse national origin discrimination" based on his status as an "American born and educated surgeon." (Doc. No. 133, p. 23, ¶¶ 109-111). Defendants argue in their respective motions that: 1) § 1981 protects against racial and ethnic discrimination in the workplace and does not address retaliation claims based on "whistleblower" activities of the type alleged by Plaintiff; and 2) Plaintiff does not establish a *prima facie* case of "reverse discrimination" because he fails to create a genuine issue of material fact on the issue of whether he was treated less favorably than other similarly situated individuals. (Doc. No. 137, pp. 38-40; Doc. No. 140, pp. 18-21).

The elements of a *prima facie* case under § 1981 are the same as those under Title VII. *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502, 506 n.1, 113 S. Ct. 2742, 125 L.Ed.2d 407 (1993). A plaintiff carries the initial burden to establish a *prima facie* case for retaliation, and to meet that burden he must show: 1) he engaged in activity protected under the statute; 2) he suffered adverse action by the employer either after or contemporaneous with his engagement in the protected activity; and 3) a causal

58

connection between his protected activity and the employer's adverse action. *Slagle v. County of Clarion*, 435 F.3d 262, 265 (3d Cir. 2006) (citation omitted); *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997); *see also Schatzman v. Martin Newark Dealership, Inc.*, 158 F.Supp.2d 392, 400 (D. Del. 2001) (holding that to prevail on a § 1981 claim a plaintiff must prove he engaged in a protected activity); *Tucker v. Merck & Co., Inc.*, 2004 WL 350467 *3 (holding protected activity under § 1981 is activity related to making a claim of racial discrimination and activities not related to making claims of racial discrimination are not protected under § 1981); *Dean v. Kraft Foods North America*, 2005 WL 1793532 *9 (E.D. Pa. 2005) (holding § 1981 protects employees from retaliation for opposition to racial discrimination). A plaintiff also carries the initial burden to establish a *prima facie* case for reverse <u>racial</u> discrimination in that he must show that the employer is treating similarly situated people less favorably than others because of their race; however, a claim for <u>national origin</u> discrimination is not a viable claim under § 1981. *Iadimarco v. Runyon*, 190 F.3d 151, 163 (3d Cir. 1999); 42 U.S.C. § 1981.

The *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) burden-shifting analysis applies to claims of retaliation and reverse discrimination. *Krouse*, 126 F.3d at 500 (retaliation); *Iadimarco*, 190 F.3d at 163 (reverse discrimination). Under this analysis, the plaintiff must first establish a *prima facie* case of discrimination. *McDonnell Douglas*, 411 U.S. at 804-05. If the plaintiff is successful in doing so, the burden then shifts to the defendant to set forth a legitimate, non-discriminatory reason for the discharge. *Id.* The burden on the defendant is "relatively light." *Fuentes v. Perskie*, 32 F.3d 759, 764 (3d Cir. 1994). If the defendant sets forth such a reason, the burden shifts back to the plaintiff who must then show that the reason asserted by the defendant is

59

a pretext for discrimination. *McDonnell Douglas*, 411 U.S. at 804-05. The plaintiff's burden at this stage is a heavy one. *Kautz v. Met-Pro. Inc.*, 412 F.3d 463, 467 (3d Cir. 2005). In order to show the proffered reason was, in fact, pretext, the plaintiff must point to "*some* evidence, direct or circumstantial, from which a fact finder could reasonably either: 1) disbelieve the employer's articulated reasons; or 2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764. Thus, to survive a motion for summary judgment the plaintiff "must make a *prima facie* showing of discrimination and point to 'evidence establishing a reasonable inference that the employer's proffered explanation is unworthy of credence.'" *Hugh v. Butler County Family YMCA*, 418 F.3d 265, 268 (3d Cir. 2005) (quoting *Sorba v. Penn Drilling Co.*, 821 F.2d 200, 205 (3d Cir. 1987)).

Plaintiff fails to establish a *prima facie* case of retaliation. First, with respect to his retaliation claim, Plaintiff fails to set forth any evidence that he engaged in conduct protected by §1981. (*See* Doc. No. 147). Plaintiff's only allegation of protected conduct is that he engaged in what he terms "whistleblower activities." (Doc. No. 133, p. 23, ¶ 111). Whistleblower activities, however, are not protected under §1981, rather a claim for retaliation for such conduct must be brought under the appropriate whistleblower statute. *See, e.g.*, 43 P.S. § [1422], *et seq.* Section 1981 covers retaliation for engaging in the protected activity of reporting discrimination. 42 U.S.C. § 1981.[18] Plaintiff's failure to provide evidence that he engaged in any activity protected under §1981 results in his inability to make out a *prima facie* case of retaliation. Accordingly, the Court finds no genuine issue of material

_____

[18] Although Plaintiff made a claim under a state whistleblower statute in his Second Amended Complaint, the Court does not have jurisdiction over this claim as discussed later in this Memorandum Opinion and Order. (Doc. No. 133).

fact exists regarding Plaintiff's §1981 claim for retaliation and the Defendants are entitled to judgment as a matter of law, therefore, the Defendants shall be granted summary judgment on this claim.

Second, Plaintiff claims reverse national origin discrimination in violation of § 1981. (Doc. No. 133, p. 23, ¶111). Section 1981, however, does not recognize claims for national origin discrimination. 42 U.S.C. § 1981. Therefore, Plaintiff's assertion of reverse national origin discrimination under §1981 fails to state a claim upon which relief can be granted.[19]

### D.     42 U.S.C. §11112

Plaintiff attempts to create a cause of action for himself under 42 U.S.C. §11112 by asserting that this statute sets out a "per se standard" of "professional peer review." Plaintiff alleges Lee and Conemaugh breached this per se duty and "the applicable Medical Staff By-laws" in a variety of ways. (Doc. No. 133, pp. 30-33). Defendants argue that this provision does not create a cause of action, but instead pertains to whether or not a defendant will be permitted to utilize the immunity provision of §11111. (Doc. No. 137, pp. 55-56; Doc. No. 140, pp. 43-44). The Court agrees with Defendants' position.

The purpose of 42 U.S.C. §11111, the immunity provision of the Health Care Quality Improvement Act (hereinafter "HCQIA"), is to grant immunity from monetary damages to those persons participating in professional peer review activities in order ". . . to deter antitrust suits by disciplined

---

[19]Furthermore, even assuming Plaintiff had asserted reverse discrimination based on his race rather than his national origin, Plaintiff fails to set forth any evidence establishing that any similarly situated doctors were treated differently than himself. (*See* Doc. Nos. 133, 146 and 147). This is required in order to set forth a *prima facie* case of reverse discrimination. Plaintiff's failure to set forth such evidence would result in no genuine issue of material fact existing on a claim for reverse discrimination and, therefore, summary judgment in favor of the Defendants would be proper. *Iadimarco*, 190 F.3d at 163.

physicians." *Gordon v. Lewiston Hosp.*, 423 F.3d 184, 201 (3d Cir. 2005). The next section, §11112, establishes guidelines that, if followed, will assure that those involved in the peer review process in question will be entitled to immunity. 42 U.S.C. §11112. The statue provides a "safe harbor" for those that follow its guidance. *Id.*; *see also Wieters v. Roper Hosp., Inc.*, 58 Fed. Appx. 40, 45-46, 2003 WL 550327 *5-6 (4th Cir. 2003)(holding hospital procedure that was fair to physician under the circumstances satisfied the requirements for immunity from damage lawsuits under the HCQIA, even though it did not strictly adhere to the hospital bylaws or safe harbor provisions of the HCQIA). This section can be used by a plaintiff to argue that a defendant who claims immunity under the HCQIA is not, in fact, entitled to such immunity due to failures to comport with the standards set forth in §11112. *See Matthews*, 87 F.3d 624, 634-38 (analyzing whether defendants complied with the requirements of the statute to determine whether they were entitled to immunity). What §11112 does not do, however, is create the basis of a cause of action for a physician who has been subject to a peer review process, such as Plaintiff, to claim that failure to use the standards set out in the section entitles him to some type of recovery. 42 U.S.C. §§11111, 11112. Therefore, Plaintiff fails to, and cannot, state a claim upon which relief can be granted under 42 U.S.C. §11112.

## E.   CLAIMS BROUGHT UNDER SUPPLEMENTAL JURISDICTION

Pursuant to 28 U.S.C. §1367(a), "in any civil action of which the district courts have original jurisdiction, the district courts shall have supplemental jurisdiction over all other claims that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy. . . ." However, 28 U.S.C. §1367(c) provides that "[t]he district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if . . . (3) the district court has

dismissed all claims over which it has original jurisdiction. . . ."

The Third Circuit has recognized that, "where the claim over which the district court has original jurisdiction is dismissed before trial, the court must decline to decide the [supplemental] state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Hedges v. Musco*, 204 F.3d 109, 123 (3d Cir. 2000) (quoting *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir. 1995)).

The Court finds that judicial economy, convenience, and fairness to the parties in the case *sub judice* do not provide an affirmative justification for deciding the Plaintiff's supplemental state claims. Plaintiff has brought numerous state court lawsuits centered on the issues presented in this case and according to Plaintiff, the claims he filed in his latest state court action Untracht III, are all contained in the case *sub judice* and are so related to claims in this action that they form part of the same case or controversy under 28 U.S.C. §1367. (Doc. No. 146, pp. 3-4). Therefore, the Court finds that Plaintiff currently has a case pending before the state court which raises issues based on the same set of facts and which is a more appropriate forum for Plaintiff's state claims. As a result, the Court, in its discretion, declines to exercise supplemental jurisdiction over Plaintiff's state claims. Accordingly, Plaintiff's state claims of intentional infliction of emotional distress, tortious interference with existing and prospective contractual relationships, defamation per se (libel and slander), breach of contract violation of Pennsylvania Unfair Trade Practices and Consumer Protection Law, Civil Conspiracy, violation of Pennsylvania MCARE and whistleblower laws are dismissed.

Finally, Plaintiff argues that the Court must assert supplemental jurisdiction over the claims he currently has pending in his state court action, Untracht III, because, as discussed above, according to

63

Plaintiff the claims are so related to claims in this action that they form part of the same case or controversy under 28 U.S.C. §1367. (Doc. No. 146, pp. 3-4). Although a district court assumes supplemental jurisdiction over some claims, a district court does not assume supplemental jurisdiction over claims that a plaintiff chooses to bring in state court separately from the claims he brings in federal court. *See* 28 U.S.C. §1367. What Plaintiff is in essence asking the Court to do is to allow him to remove an action he filed in state court. Removal by a plaintiff is not permitted because the plaintiff had the original choice of forum. 28 U.S.C. § 1446; *Underwriters (Philippines), Inc. v. Continental Ins. Co.*, 843 F.2d 1253, 1260 (9th Cir. 1988); *see also Share v. Sears, Roebuck & Co.*, 550 F.Supp. 1107, 1109 (E.D. Pa. 1982) (holding only defendants, not third party defendants or plaintiffs, can remove an action); *Resident Advisory Bd. v. Tate*, 329 F.Supp. 427, 432 (E.D. Pa. 1971) (holding if the plaintiff chooses state court as his forum he cannot complain he will be injured if the case remain in state court). Only defendants may remove an action. *Id.* Thus, the Court finds Plaintiff may not remove his state court action. In addition, the Court granted summary judgment on all of Plaintiff's federal claims and dismissed his state claims under 28 U.S.C. §1367(c). For these reasons, Plaintiff's request that the Court assert supplemental jurisdiction over the claims he brought in his state court action is denied.

## F. DEFENDANTS LEE REGIONAL HEALTH SYSTEMS, INC. and LEE REGIONAL HEALTH SYSTEM FOUNDATION, INC.

Defendants Lee Regional Health Systems, Inc. and Lee Regional Health System Foundation, Inc. were added by Plaintiff in his Second Amended Complaint. (Doc. No. 133, p. 3). Lee Regional Health Systems, Inc. and Lee Regional Health System Foundation, Inc. filed a Motion to Dismiss Plaintiff's Second Amended Complaint (Doc. No. 161) and a Brief in Support (Document No. 162).

Lee Regional Health Systems, Inc. and Lee Regional Health System Foundation, Inc. argue no claims were made against them. (Doc. No. 161, p. 4). Plaintiff claims he intended to include them in the allegations he made against the "Collective Lee Defendants," however, he does not include them in his definition of the "Collective Lee Defendants" in his Complaint. (Doc. No. 163, p. 3; Doc. No. 133, p. 5, ¶ 23). Furthermore, Plaintiff claims he intended to sue them anywhere he used the term "All Defendants." (Doc. No. 163). Plaintiff, however, makes no specific allegations against Lee Regional Health Systems, Inc. and Lee Regional Health System Foundation, Inc. in his Complaint. (*See* Doc. No. 133). Therefore, the Court finds Plaintiff fails to state a claim upon which relief can be granted against Lee Regional Health Systems, Inc. and Lee Regional Health System Foundation, Inc.[20] Accordingly, Lee Regional Health Systems, Inc. and Lee Regional Health System Foundation, Inc.'s Motion to Dismiss is granted with prejudice because Plaintiff has filed a Complaint, an Amended Complaint and a Second Amended Complaint but Plaintiff has failed to state claims upon which relief can be granted; therefore, these two Defendants are entitled to summary judgment or dismissal of all his claims and, further, the Court finds that permitting a third amended complaint would not result in Plaintiff being able to state any viable claims.

## IV. CONCLUSION

In conclusion, summary judgment in favor of all of the Defendants is granted on Plaintiff's Sherman Act § 1 claim, Sherman Act § 2 claim, 42 U.S.C. §1983 claim and 42 U.S.C. §1981 claim for

---

[20]To the extent Plaintiff might have made any claims against Lee Regional Health Systems, Inc. and Lee Regional Health System Foundation, Inc., these two Defendants incorporated the arguments made in Doc. Nos. 136, 137, 138, 139, 140, 141, 142, 151, 154 and 155 into their Motion to Dismiss, therefore, those claims, if any, are dismissed for the same reasons set forth in this Memorandum Opinion and Order.

65

retaliation. Plaintiff's claim under 42 U.S.C. §11112 is dismissed with prejudice. Plaintiff's claim for reverse national origin discrimination under 42 U.S.C. § 1981 is also dismissed with prejudice. All of Plaintiff's remaining claims, over which this Court had supplemental jurisdiction, are dismissed because the Court, having dismissed the claims over which it had original jurisdiction, must decline to exercise its supplemental jurisdiction because judicial economy, convenience and fairness to the parties do not provide an affirmative justification for deciding these claims. Therefore, the Lee Defendants' and the Conemaugh Defendants' Motions to Dismiss or, in the alternative, for Summary Judgment (Doc. Nos. 136, 139) are granted and Plaintiff's Cross Motion for Summary Judgment, Injunctive Relief and for the Court's Assumption of Supplemental Jurisdiction (Doc. No. 146) is denied. Additionally, Lee Regional Health Systems, Inc. and Lee Regional Health System Foundation, Inc.'s Motion to Dismiss (Doc. No. 161) is granted with prejudice.

Finally, the Court finds that the Conemaugh Defendants' Motion to Amend the Caption (Doc. No. 138) is rendered moot.

An appropriate order follows.

66

**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| STEVEN H. UNTRACHT, MD, PhD, FACS | ) ) ) |
| Plaintiff, | ) ) |
| v. | ) Civil Action No. 03-199J |
| ERDEN FIKRI, MD, et al. | ) ) ) |
| Defendants. | ) |

**ORDER**

**GIBSON, J**.

AND NOW, this 29th day of August, 2006 after considering the following motions: Motion to

Dismiss Plaintiff's Second Amended Complaint by Erden Fikri, Dinesh Mathur, Vincent Fiorica, Terry

Wahl, David R. Davis, Sanders Ergas, P. James Ridella, Bhaskaran Murali, Will H. Farthing, Brian

Gunnlaugson, Richard Cartwright, Denise Weisbrodt, William M. Carney, Harvey Slater, George H.

Benz, Jr., Stewart M. Flam, R. Joseph Federowicz, Dickey McCamey & Chilcote, P.C., UPMC Health

System and UPMC Lee Regional (hereinafter sometimes referred to as "Lee Defendants") (Document

No. 136), their Brief in Support (Document No. 137) and their Revised Exhibits in Support (Document

No. 142); Motion to Amend the Caption by Richard Saluzzo, Jacob Kolff, Bruce Duke, Narendra Pai,

William Fritz, Paul Weygandt, William M. Carney, Robert D. Fry, Conemaugh Health System and

Memorial Medical Center (hereinafter sometimes referred to as "Conemaugh Defendants") (Document

No. 138); Motion to Dismiss, or, in the Alternative, for Summary Judgment with Respect to Plaintiff's

Second Amended Complaint by Conemaugh Defendants (Document No. 139), their Brief in Support

(Document No. 140) and their Appendix to their Brief in Support (Document No. 141); Plaintiff's Cross Motion for Summary Judgment, Injunctive Relief and for the Court's Assumption of Supplemental Jurisdiction (Document No. 146) and his Brief in Support (Document No. 147); Conemaugh Defendants' Response to Plaintiff's Cross Motion for Summary Judgment, Injunctive Relief and for the Court's Assumption of Supplemental Jurisdiction (Document No. 151) and their Brief in Support (Document No. 152); Lee Defendants' Response To Plaintiff's Cross Motion for Summary Judgment, Injunctive Relief and for the Court's Assumption of Supplemental Jurisdiction (Document No. 154) and their Brief in Support (Document No. 155); and Motion to Dismiss Plaintiff's Second Amended Complaint by Lee Regional Health Systems, Inc. and Lee Regional Health System Foundation, Inc. (Document No. 161) and their Brief in Support (Document No. 162); and Plaintiff's Brief in Opposition to Lee Regional Health Systems, Inc. and Lee Regional Health System Foundation, Inc.'s Motion to Dismiss (Document No. 163), IT IS HEREBY ORDERED that summary judgment in favor of all of the Defendants is GRANTED on Plaintiff's Sherman Act § 1 claim, Sherman Act § 2 claim, 42 U.S.C. §1983 claim and 42 U.S.C. §1981 claim for retaliation.

IT IS FURTHER ORDERED that Plaintiff's claim under 42 U.S.C. §11112 is DISMISSED with prejudice.

IT IS FURTHER ORDERED that Plaintiff's claim for reverse national origin discrimination under 42 U.S.C. § 1981 is also DISMISSED with prejudice.

68

IT IS FURTHER ORDERED that all of Plaintiff's remaining claims, over which this Court had supplemental jurisdiction, are dismissed because the Court, having dismissed the claims over which it had original jurisdiction, must decline to exercise its supplemental jurisdiction because judicial economy, convenience and fairness to the parties do not provide an affirmative justification for deciding these claims.

IT IS FURTHER ORDERED that the Lee Defendants' and the Conemaugh Defendants' Motions to Dismiss or, in the alternative, for Summary Judgment (Document. Nos. 136, 139) are GRANTED and Plaintiff's Cross Motion for Summary Judgment, Injunctive Relief and for the Court's Assumption of Supplemental Jurisdiction (Document. No. 146) is DENIED.  IT IS FURTHER ORDERED that Lee Regional Health Systems, Inc. and Lee Regional Health System Foundation, Inc.'s Motion to Dismiss (Document. No. 161) is GRANTED with prejudice.

IT IS FURTHER ORDERED that the Conemaugh Defendants' Motion to Amend the Caption (Doc. No. 138) is rendered MOOT.

BY THE COURT:

**KIM R. GIBSON,**
**UNITED STATES DISTRICT JUDGE**